FILED
17-0894
12/20/2017 1:53 PM
tex-21414862
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

No. 17-0894

# IN THE SUPREME COURT OF TEXAS

---

## Glenn Hegar, Comptroller of Public Accounts of the State of Texas and Ken Paxton, Attorney General of the State of Texas, Petitioners,

### v.

## Gulf Copper and Manufacturing Corporation, Respondent.

---

On Petition for Review
from the Third Court of Appeals at Austin, Texas
Appeal No. 03-16-00250-CV

---

### Petition for Review

---

KEN PAXTON
Attorney General of Texas

JEFF MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney
General

JAMES E. DAVIS
Deputy Attorney General for Civil
Litigation

JACK HOHENGARTEN
Tax Division Chief
State Bar No. 09812200
Tax Division
P.O. Box 12548; MC-029
Austin, Texas 78711-2548
TEL: (512) 475-3503
FAX: (512) 478-4013

*Counsel for Petitioners*

## IDENTITY OF PARTIES AND COUNSEL

*Petitioner:*

Glenn Hegar, Comptroller of Public Accounts of the State of Texas

Ken Paxton, Attorney General for the State of Texas

*Counsel for Petitioners*

JACK HOHENGARTEN
Tax Division, Division Chief
Office of the Attorney General
State Bar No. 09812200
Tax Division MC 029
PO Box 12548
Austin, Texas 78711-2548
Tel: (512) 475-3503
Fax: (512) 478-4013
Jack.hohengarten@oag.texas.gov
*Appellate Counsel*

CHARLES K. ELDRED
Assistant Attorney General, Tax Division
State Bar No. 00793681
Office of the Attorney General
P.O. Box 12548 (MC 029)
Austin, Texas 78711-2548
Tel: (512) 475-1743
Fax: (512) 478-4013
charles.eldred@oag.texas.gov
*Appellate and Trial Counsel*

*Respondents*

Gulf Copper and Manufacturing Corporation

*Counsel for Respondents*

James F. Martens
State Bar No. 13050720
jmartens@textaxlaw.com
Danielle Ahlrich
State Bar No. 24059215
dahlrich@textaxlaw.com
MARTENS, TODD, LEONARD & AHLRICH
301 Congress Ave., Suite 1950
Austin, Texas 78701
Tel: (512) 542-9898
*Appellate and Trial Counsel*

and

Amanda Taylor
BECK REDDEN, PLLC
ataylor@beckredden.com
State Bar No. 24045921
515 Congress Ave., Suite 1900
Austin, Texas 78701
Tel: (512) 708-1000
*Appellate and Trial Counsel*

# TABLE OF CONTENTS

Identity of Parties and Counsel ................................................................ii

Table of Contents .................................................................................iv

Index of Authorities...............................................................................vi

Record References ...............................................................................viii

Statement of the Case ..........................................................................viii

Statement of Jurisdiction.........................................................................x

Issues Presented....................................................................................xii

Statement of Facts .................................................................................. 1

Summary of the Argument ...................................................................... 5

Argument................................................................................................ 7

    I.    Gulf Copper's costs in repairing and outfitting drilling rigs,
          and Sabine Surveyors' costs in surveying marine vessels,
          were not deductible as costs-of-goods sold. ...................................7

      A.  Background: Tax Code section 171.1012. ...................................7

      B.  There was no evidence of section 171.1012(i) costs to
          support a remand. ......................................................................9

      C.  The court of appeals' decision regarding section
          171.1012(i) also defeats other key provisions in the
          cost-of-goods-sold statute.........................................................14

    II.   Gulf Copper cannot exclude the contested subcontractor
          payments from revenue under Tax Code §171.1011(g)(3)...........16

      A. Background: Section 171.1011(g)(3).........................................16

      B. There is no evidence that the subcontract work constituted
         "services, labor, or materials in connection with the actual
         or proposed design, construction, remodeling, or repair of
         improvements on real property"................................................18

C. There is no evidence that the subcontractor payments constituted "flow-through funds that are mandated by contract to be distributed to other entities." ............................................. 21

Prayer ........................................................................................................ 25

Certificate of Compliance ....................................................................... 26

Certificate of Service ............................................................................... 26

Appendix ................................................................................................... 27

Appendix Table of Contents ................................................................... 28

# INDEX OF AUTHORITIES

**Cases**

*Combs v. Newpark Resources, Inc.*,
422 S.W.3d 46 (Tex. App.—Austin 2013, no pet.) ......................... 12, 13

*Owens Corning v. Hegar*,
04-16-00211-CV, 2017 WL 1244444, at *3 (Tex. App.—San Antonio
Apr. 5, 2017, pet. denied) .................................................................24

*Sheshunoff v. Sheshunoff*,
172 S.W.3d 686 (Tex. App.—Austin 2005, pet. denied) ......................10

*Titan Transp. LP v. Combs*,
433 S.W.3d 627 (Tex. App.—Austin 2014, pet. denied) .......... 18, 19, 24

**Statutes**

Tex. Gov't Code § 311.011(a) ................................................... 12, 23

Tex. Gov't Code § 22.001(a) ...........................................................ix

Tex. Prop. Code § 53.023 ..............................................................10

Tex. Prop. Code § 53.001(3) & (4) ................................................10

Tex. Prop. Code § 53.001(4)(B)......................................................11

Tex. Prop. Code § 53.021 ..............................................................10

Tex. Prop. Code § 56.001(1)...........................................................11

Tex. Tax Code §171.1011(i) ...........................................................16

Tex. Tax Code § 171.1011(g)(3) ...............................................*passim*

Tex. Tax Code § 171.1012...........................................................*passim*

Tex. Tax Code § 171.1012(a)(3)(B)(ii) and (c)(1) .......................................5

Tex. Tax Code § 171.1012(a)(3)(B)(ii) ...................................... 5, 8, 14

Tex. Tax Code § 171.1012(c)...................................................... 4, 6

Tex. Tax Code § 171.1012(h)..........................................................11

Tex. Tax Code § 171.1012(i) ........................................................ *passim*

Tex. Tax Code § 171.1012(a)(1) and (c) ................................................... 8

Tex. Tax Code § 171.1012(c), (d), (f) .................................................. 4, 6

**Rules**

34 TAC § 3.588 ............................................................................... 10

**Other Authorities**

79th Leg., 3d C.S., ch.1, § 5, 2006 Tex. Gen. Laws 1, 10
    (amended 2013) ...................................................................... 17

Act of May 2, 2006, 79th Leg., 3rd C.S., ch. 1, § 5, 2006 Tex. Gen. Laws
    1, 8 (former Tex. Tax Code § 171.101(a)), current version at Tex. Tax
    Code § 171.101(a)(1) ................................................................. x

42. Tex. Reg. 5235-36 (Sept. 29, 2017) .............................................. 10

# RECORD REFERENCES

References to the Clerk's Record are in the form "CR.[Page#]"

References to the Reporter's Record are in the form "[Volume#].RR.[Page#]"

References to Plaintiff's Exhibits are in the form "PX[Exhibit#]"

References to Defendants' Exhibits are in the form "DX[Exhibit#]"

References to items in the Appendix are in the form "App.[Appendix#]"

# STATEMENT OF THE CASE

| | |
|---|---|
| *Nature of the case*: | Franchise tax protest suit under Chapters 112 and 171 of the Texas Tax Code. |
| *Course of Proceedings*: | Lawsuit filed November 4, 2014. CR.3. Bench Trial February 1–2, 2016. Judgment entered February 22, 2016. CR 294–95 [App.1]. Notice of Appeal filed April 13, 2016. CR 302–03. |
| *Trial Court*: | 201st District Court, Travis County, Texas The Honorable Amy Clark Meachum. |
| *Disposition:* | Judgment for Plaintiff/Appellee. Plaintiff/Appellee entitled to refund of $838,117.84 plus statutory interest. |
| *Parties to the appeal*: | Appellants: Glenn Hegar, Comptroller of Public Accounts of the State of Texas, and Ken Paxton, Attorney General for the State of Texas |

Appellee:

Gulf Copper and Manufacturing
Corporation

*Court of appeals*: Third Judicial District of Texas at Austin

*Justices who participated*: Chief Justice Rose,
Justices Field and Bourland

*Citation*: *Hegar v. Gulf Copper and Manufacturing Corporation*, No. 03-16-0250-CV, 2017 WL 3471064 (Tex. App.—Austin Aug. 11, 2017) (herein, "Opinion at __.") [App. C]

*Disposition*: The Third Court of Appeals, opinion by Justice Field, affirmed in part and reversed and remanded in part to 201st Judicial District Court, Travis County, Texas, for further proceedings. Motion for Rehearing denied September 21, 2017.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under Texas Government Code section 22.001(a) because the case presents issues important to the jurisprudence of the state, specifically important issues of statutory interpretation that impact state revenue.

Although Gulf Copper can deduct the contested amounts on its federal corporate income tax return or its financial statements, not all legitimate business expenses are deductible for margin tax purposes. By restricting margin tax deductions and thereby expanding the tax base, the Legislature was able to reduce the tax rate from 4.5 percent under the former earned surplus tax to one percent or less under the margin tax. *See*, Act of May 2, 2006, 79th Leg., 3rd C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 8 (former Tex. Tax Code § 171.101(a)), current version at Tex. Tax Code § 171.101(a)(1).

If, however, the balance between the low margin tax rate and the limited deductions is disrupted, there could be a significant revenue impact to the State of Texas. Accordingly, this Court should give serious consideration to the implications of the Opinion below, which

allows service providers to take the cost-of-goods-sold deduction when they are not selling goods, and further, allows taxpayers to exclude revenues from margin merely because they are paying expenses owed under a contract.

# ISSUES PRESENTED

1.  Do the services performed by Gulf Copper or its subsidiary constitute "furnishing labor or materials to a project for the construction, improvement, remodeling, repair, or industrial maintenance ... of real property" such that Gulf Copper may deduct under Tax Code section171.1012(i) its costs of:
    a. Repairing or upgrading drilling rigs at Gulf Copper's waterfront facilities, before the commencement of offshore drilling; or
    b. Surveying marine vessels, including drilling rigs at Gulf Copper's waterfront facilities?

2.  May Gulf Copper exclude from its total revenue, under Tax Code section 171.1011(g)(3), hourly payments made to subcontractors? This question turns on:
    a. Whether payments were "made under a contract . . . to provide services, labor, or materials *in connection with* the actual or proposed design, construction, remodeling, or repair of improvements *on real property*," when the subcontractor payments were for work repairing or upgrading drilling rigs at Gulf Copper's waterfront facilities, before the commencement of offshore drilling.
    b. Whether payments Gulf Copper made to subcontractors are "flow-through funds that are mandated by contract to be distributed to other entities," when Gulf Copper was not required by contract to use customer payments to pay subcontractors.

3.  **[Unbriefed]** Gulf Copper had the burden of proof on its cost-of-good-sold claim. Where Gulf Copper put on *no* evidence of allowable costs according with section 171.1012 or controverting the Comptroller's cost-by-cost analysis—relying instead on an erroneous legal argument—did the court of appeals err in remanding the case for a new trial on Gulf Copper's cost-of-goods-sold claim?

## STATEMENT OF FACTS

### *The margin tax dispute.*

The court of appeals correctly stated the nature of the case as a suit "seeking a refund of franchise taxes that Gulf Copper paid under protest." Specifically, this franchise or "margin" tax case involves a dispute over (1) the amounts Gulf Copper may deduct as cost of goods sold, and (2) the amounts that it may exclude from its revenues.

### *Gulf Copper's business.*

The trial court made the following findings of fact regarding Gulf Copper's business. Gulf Copper is primarily engaged in the business of surveying, manufacturing, upgrading, and repairing offshore drilling rigs. CR. 296-97[App. B] (Finding of Fact 10).[1] Gulf Copper repairs rigs by removing defective portions, manufacturing replacement components, and installing the replacement components onto the rigs. Gulf Copper also manufactures and installs new components for rigs that do not

---

[1] Although Gulf Copper manufactures *components* for the rigs, it is undisputed that it does not own, manufacture or sell the rigs themselves. 3.RR.39–40; *see also* Opinion at *4-5.

replace an existing component.   Finding of Fact 12.

Gulf Copper's customers are primarily rig owners and drilling contractors who use their offshore rigs to drill for oil and gas on behalf of exploration and production ("E&P") companies.   Finding of Fact 9. Gulf Copper's work enables the rigs (1) to meet and maintain the certification requirements by classification societies, (2) to comply with governing regulations, and (3) to satisfy an E&P company's contractual requirement for a specific drilling project. Finding of Fact 16.

Gulf Copper owns all of the outstanding shares of a subsidiary named Sabine Surveyors. Finding of Fact 1.   Sabine Surveyors is a limited partnership primarily engaged in the business of marine vessel surveying.   Finding of Fact 2. For franchise tax report year 2009 (the accounting period of May 1, 2007 to April 30, 2008), Gulf Copper, Sabine Surveyors, and others (hereinafter collectively referred to as "Gulf Copper") joined in the filing of combined franchise tax report. Finding of Fact 7.

With regard to the exclusions from revenue, the trial court made

these additional findings of fact. Gulf Copper performs its work using both employees and subcontractors. Finding of Fact 22. Gulf Copper's customers often approve or require Gulf Copper's use of certain subcontractors to complete the work... Finding of Fact 23.

Gulf Copper charges its customers for subcontractor work using a formula that is based upon Gulf Copper's actual cost of the subcontractor(s) plus a mark-up. Regardless of how the subcontractor is billed, Gulf Copper's resulting mark-up to the customer is generally between 15-20 percent. Finding of Fact 24. When Gulf Copper's customers pay Gulf Copper for work performed by subcontractors, Gulf Copper retains the portion of the payment attributable to its mark-up (generally between 15- 20 percent) and flows through the remainder of the customer's payment to the subcontractor. Finding of Fact 25. The subcontractor payments flow from Gulf Copper's customer, through Gulf Copper, to Gulf Copper's subcontractors who performed the work for the customer. Finding of Fact 26.

Finally, it is undisputed that "[t]he drilling rigs are delivered to Gulf Copper's facility where Gulf Copper performs the work…" Opinion at * 4.

### *The Comptroller's audit.*

The Comptroller audited Gulf Copper and assessed additional franchise taxes in the amount of $692,626.66 (plus interest, for a then current total of $838,117.84). The two major adjustments were to: (1) the cost-of-goods-sold deduction and; (2) the exclusion from revenue of subcontractor payments.

The Comptroller allowed the cost-of-goods-sold deduction for labor costs incurred in the production or "fabrication" of rig components and parts installed on the rigs (and thus "sold" to the rig owners), plus other costs specifically allowable under the statute. *See* Opinion at * 3; *see also* Tex. Tax Code § 171.1012(c), (d), (f). But the Comptroller disallowed, as non-deductible "services," Gulf Copper's labor costs incurred in installing components, removing defective components, painting, welding, fixing cranes, sandblasting, and coating—because none of those labor costs were shown to be costs of acquiring or producing "goods" for sale. *See id.*

§ 171.1012(a)(3)(B)(ii) and (c)(1); CR. 297 (Findings of Fact 10, 12, 13 [App. B]; 2.RR.131-32, 188, 192.

The Comptroller auditor also disallowed Sabine Surveyors' costs in his calculation of Gulf Copper's cost-of-goods-sold deduction—because surveying is a service and the costs of surveying are not costs of acquiring or producing "goods" for sale.   5.RR.11–15.

As to the second audit issue, the Comptroller auditor determined that the $79,405,230 in payments to subcontractors did not meet the statutory requirements for the exclusion from revenue, and should be considered instead in the calculation of Gulf Copper's cost-of-goods-sold deduction.

Gulf Copper paid the assessment under protest, and these two adjustments are the principal issues in this Petition for Review.

## SUMMARY OF THE ARGUMENT

### *Cost-of-goods-sold deduction*

There is no evidence in the record to support the contested deductions.   Gulf Copper does not own or sell drilling rigs – it repairs and outfits them at its waterfront facility.   The repair and outfitting of

drilling rigs is not the sale of "goods." Therefore, Gulf Copper's costs in repairing and outfitting the rigs are not deductible as costs of acquiring or producing "goods" under Tax Code § 171.1012(c), (d), or (f).

Furthermore, in performing rig work at its waterfront facility, Gulf Copper is not "furnishing labor or materials to a project for the construction, improvement, remodeling, repair, or industrial maintenance . . . of real property. . ." Rather, it is providing repair and outfitting services to the owner of equipment, who in turn, contracts with the E&P company to provide that equipment for offshore drilling. This indirect relationship does not qualify Gulf Copper for the cost-of-goods-sold deduction under Tax Code § 171.1012(i). Gulf Copper's rig work adds value to the rigs, but it does not add value to any real-property project.

Gulf Copper's affiliate, Sabine Surveyors, does not own or sell goods either. And similarly, Sabine Surveyors is not by virtue of its surveying services, furnishing labor or materials "to a project for the construction, improvement, remodeling, repair, or industrial maintenance ... of real property," so as to qualify for the cost-of-goods-sold deduction under Tax Code § 171.1012(i).

*Revenue exclusion for subcontractor payments*

With regard to the flow-through exclusion from revenue, the payment of subcontractors for rig repair, before the commencement of drilling, does not constitute evidence of payment for "services, labor, or materials in connection with the actual or proposed design, construction, remodeling, or repair of improvements on real property" under Texas Tax Code §171.1011(g)(3).

Furthermore, the flow-through exclusion is proper only where the taxpayer is *contractually* obligated to pay its subcontractors from or based on payments that it has received from other parties, and, here, there is no such contract in evidence.

## ARGUMENT

I.     **Gulf Copper's costs in repairing and outfitting drilling rigs, and Sabine Surveyors' costs in surveying marine vessels, were not deductible as costs-of-goods sold.**

**A. Background: Tax Code section 171.1012.**

Gulf Copper determined its "margin" by deducting cost of goods sold from total revenue. Opinion at *3. The cost-of-goods-sold deduction is governed by Tax Code section 171.1012, which permits a business to

subtract "all direct costs of acquiring or producing the goods." Tex. Tax Code § 171.1012(a)(1) and (c).

"Goods" means "real or tangible personal property sold in the ordinary course of business of a taxable entity." *Id.* The definition of "tangible personal property" expressly excludes "services." *Id.* § 171.1012(a)(3)(B)(ii)). Thus, sellers of services are not ordinarily eligible for the cost-of-goods-sold deduction.

To take a deduction under the cost-of-goods-sold statute, the entity must own the "goods" that it sells. *Id.* § 171.1012(i). Gulf Copper did not own the drilling rigs that it repaired and outfitted, and Sabine Surveyors did not own the marine vessels that it surveyed. The third sentence of subsection (i), however, allows certain service providers to subtract their costs from revenue as cost-of-goods-sold by "considering" them to be owners of their labor and materials:

> A taxable entity furnishing labor or materials to a project for the construction, improvement, remodeling, repair, or industrial maintenance ... of real property is *considered to be an owner of that labor or materials and may include the costs, as allowed by this section,* in the computation of cost of goods sold.

## B. There was no evidence of section 171.1012(i) costs to support a remand.

Because there was no evidence supporting application of the subsection (i)'s third sentence, the court of appeals erred when it concluded that:

> Gulf Copper presented evidence at trial that, to some extent, Gulf Copper's employees provided labor and materials to projects for improvement of real property (drilling oil wells). The Comptroller was obligated to consider to what extent the activities of Gulf Copper's employees were essential and direct components of those specific projects.

Opinion at *14.

Similarly, the court erred when it concluded that "Sabine Surveyors' costs should have been analyzed on a cost-by-cost basis to determine which of those costs met the requirement that they be integral, essential, and direct components of the offshore drilling process." *Id.*

Remand is inappropriate here, because Gulf Copper and its subsidiary's services do not constitute "furnishing labor and materials to a project for the construction, improvement, remodeling, repair, or industrial maintenance ... of real property. . ." Thus, their services do not qualify for the cost-of-goods-sold deduction under subsection (i). Tex. Tax. Code § 171.1012(i).

Subsection (i)'s phrase "furnishing labor or materials" is nearly identical to the Property Code phrase "furnishes labor or materials." *See* Tex. Prop. Code § 53.021 ("Persons Entitled to Lien"). Therefore, it is reasonable to assume that the Legislature intended substantially similar meanings. *See, e.g., Sheshunoff v. Sheshunoff*, 172 S.W.3d 686, 692 (Tex. App.—Austin 2005, pet. denied) ("When the same or a similar term is used in the same connection in different statutes, the term will be given the same meaning in one as in the other, unless there is something to indicate that a different meaning was intended.")

The Property Code provides that a person who "furnishes labor or materials" for the construction, repair, or demolition of a real property improvement may establish a lien on the real property to secure payment for the labor done or material furnished. *See* Tex. Prop. Code §§ 53.021 and 53.023 ("Payment Secured by Lien."). The definitions limit "labor" and "materials" to those used in the "direct prosecution" of the work. *Id.* at § 53.001(3) & (4).[2]

---

[2] The Comptroller has proposed rules amending 34 TAC § 3.588, which would use the Property Code definitions to define "labor" and "materials" in section 171.1012(i). *See* 42. Tex. Reg. 5235-36 (Sept. 29, 2017).

Application of the Property Code definitions provides this clear test for costs claimed under subsection (i): could Gulf Copper obtain a lien on the offshore drilling project? Here, the answer is "no." Mechanics and materialman's liens are limited to "running repairs" performed on equipment while it is being used on the project site. *See* Tex. Prop. Code § 53.001(4)(B).[3]

Gulf Copper tendered *no* evidence that the costs it seeks to deduct included any of these activities. Indeed, to establish its entitlement to the disputed deductions, Gulf Copper relied solely on an erroneous legal interpretation of subsection 171.1012(h)—which the court of appeals expressly rejected. Opinion at *9, 12. This lack of evidence requires a rendition of judgment regarding section 171.1012 costs rather than remand.

The definitions of "labor" and "materials" in the Property Code – limiting the terms to labor and materials used in the "direct prosecution" of a project – accord with subsection (i)'s words and phrases in their

---

[3] Furthermore, mineral property liens under Property Code Chapter 56 are limited to "digging, drilling, torpedoing, operating, completing, maintaining, or repairing an oil, gas, or water well." Tex. Prop. Code § 56.001(1).

proper context, as well as with the rules of grammar and usage. *See* Tex. Gov't Code Ann. § 311.011(a) (West 2013). The phrase "*to* a project for the construction, improvement . . . of real property" is prepositional phrase that functions as an adjective modifying and limiting the antecedent phrase "furnishing labor or materials."

The court of appeals nonetheless concluded that Gulf Copper "presented evidence at trial that, to some extent" it provided labor or materials that were "essential and direct components" of "specific projects." Opinion at *14. The court's "essential and direct components" language comes from its opinion in *Newpark*. In that case, the court distinguished labor that was an "essential and direct component" of the drilling project from labor "too far removed" from the project. Opinion at *14 (citing *Combs v. Newpark Resources, Inc.*, 422 S.W.3d 46, 57 (Tex. App.—Austin 2013, no pet.)).

The taxpayer in *Newpark* was able to obtain the subsection (i) deductions for labor furnished in hauling away used drilling mud and other waste products from oil well drilling sites. 422 S.W.3d at 48. But that labor was *provided to* the oil wells. In contrast, Gulf Copper's work was at least two steps removed from a real-property project. It provided

Page 12

outfitting and repair services to its customers—the rig owners—who, in turn, contracted with the E&P companies to provide them with the rigs for offshore drilling. The E&P companies then used the rigs in projects for real-property improvements or construction.

This Court has never adopted the "essential and direct components" test in *Newpark*. But even if the Court accepts that formulation, the repair and outfitting of a rig owned and operated by a third party, prior to commencement of drilling by yet another third party at a different site offshore, cannot be viewed as a "direct component" of drilling. Gulf Copper's work is "too far removed" from the construction project.

Gulf Copper fixed construction equipment. As a matter of law, fixing or upgrading construction equipment prior to its utilization is not "furnishing labor or materials *to* a project for the construction, improvement … of real property" under subsection (i). Just as fixing a bulldozer before its delivery to and use on a construction site should be properly classified as the repair of tangible personal property rather than real-property improvements, so Gulf Copper's rig work at its waterfront yards constituted the repair and upgrading of tangible personal property, not "furnishing labor or materials to" a construction project. Gulf

Copper's rig work added value to the rigs, but it did not add value to any real-property project.

This analysis applies with equal if not greater force to Sabine Surveyors, which inspected the rigs and other marine vessels. There is no evidence the subsidiary inspected offshore drilling operations or any other real-property improvements.

## C. The court of appeals' decision regarding section 171.1012(i) also defeats other key provisions in the cost-of-goods-sold statute.

The court's decision undermines the explicit exclusion of "services" from the definition of "tangible personal property" and thus from the definition of "goods." *See id.* § 171.1012(a)(3)(B)(ii). It does so by allowing the taxpayer to deduct labor costs for installing components, removing defective components, painting, welding, fixing cranes, sandblasting, and coating—even though these services had only an indirect relationship to the construction or improvement of real property. CR. 296-97 (Findings of Fact No. 10, 12 and 13)[App. B]; 2.RR.131–32, 188, 192.

The cost of a service may be allowable in a cost-of-goods-sold deduction *only if the service is a cost of acquiring or producing a "good"*

*that an entity sells or is labor in the "direct prosecution" of a real-property project.* Returning to the example of a bulldozer, this is why under section 171.1012, the salaries of employees who paint, repair, upgrade a bulldozer *for sale* would be allowable in the seller's cost-of-goods-sold deduction. The salaries are costs of "producing" the equipment "sold."

But apart from the acquisition or production expenses for the sale of the bulldozer, costs of providing services to repair, upgrade, or paint the bulldozer are not deductible. And these services do not qualify for the deduction simply because the owner of the bulldozer repaired, upgraded or painted subsequently provides it to a real-property project. Nor would the person performing the repair, upgrade or painting be able to claim the deduction.

Similarly, Gulf Copper is not selling rigs to a third-party, but rather, is providing repair and outfitting services performed at its waterfront facility.[4] That the rigs are then used by another third party

---

[4] Again, the comptroller has already allowed the deduction for the labor costs incurred in "producing" "goods"—i.e., parts and components Gulf Copper installed on the rigs and thus sold.

to drill offshore does not transform Gulf Copper's services into "labor" used in "direct prosecution" of the project under subsection (i).

**II.    Gulf Copper cannot exclude the contested subcontractor payments from revenue under Tax Code §171.1011(g)(3).**

**A. Background: Section 171.1011(g)(3)**

Taxpayers such as Gulf Copper must first determine their revenue before deducting cost of goods sold to determine "margin." In limited circumstances, the Texas Legislature has allowed taxpayers to exclude receipts that they are obligated by law or contract or fiduciary duty to pass on to another. The theory is that the receipts do not truly represent the revenue of the taxpayers. However, taxpayers are not allowed to exclude receipts merely because the receipts are used to pay the taxpayers' expenses. If that were the case, the "margin" tax would become a net income tax. To prevent just that outcome, Tax Code §171.1011(i) specifically provides:

> Except as provided by Subsection (g), a payment made under an ordinary contract for the provision of services in the regular course of business may not be excluded.

In this case, the question is whether the payments were made under an ordinary contract for the provision of services or whether they

were flow-through payments to subcontractors under section 171.1011(g)(3), which provided during the period at issue:

> A taxable entity shall exclude from its total revenue, to the extent [reported to the IRS as income], only the following flow-through funds that are mandated by contract to be distributed to other entities:
> ....
>
> (3) subcontracting payments handled by the taxable entity to provide services, labor, or materials in connection with the actual or proposed design, construction, remodeling, or repair of improvements on real property or the location of the boundaries of real property.

Act of May 19, 2006, 79th Leg., 3d C.S., ch.1, § 5, 2006 Tex. Gen. Laws 1, 10 (amended 2013) ("the (g)(3) revenue exclusion").

There are two requirements at issue: there must be "flow-through funds that are *mandated by contract* to be distributed to other entities," and the flow-through funds must be for "services, labor, or materials *in connection with* the actual or proposed design, construction, remodeling, or repair of improvements on real property."

Page 17

**B. There is no evidence that the subcontract work constituted "services, labor, or materials *in connection with* the actual or proposed design, construction, remodeling, or repair of improvements on real property"**

Finding of Fact 29 reads in part, "Gulf Copper, through its employees and subcontractors, provides labor and materials in connection with the actual or proposed construction or repair of improvements on real property;…" CR.298 [App.2]. This finding tracks the statutory language of section 171.1011(g)(3) and is really a conclusion of law reviewed de novo, without deference. It should be rejected.

The court of appeals conceded that the phrase "in connection with" is "one 'of intentional breadth,' but not without 'logical limit.'" Opinion at *7 (quoting *Titan Transp. LP v. Combs*, 433 S.W.3d 627, 637-38 (Tex. App.—Austin 2014, pet. denied)). The "logical limit" has been exceeded here for these reasons:

- Gulf Copper's work was temporally remote from the projects to improve real property – the work was performed before drilling operations commenced.

- Gulf Copper's work was physically remote from the projects to improve real property – the work was performed on tangible personal property at Gulf Copper's waterfront yards and not at the offshore drilling sites, or oil and gas wells.

- Gulf Copper's work was contractually remote from the projects to improve real property – Gulf Copper's contracts were with the rig owners, not the project owners, and Gulf Copper was not a subcontractor to the project owners.

And, when Gulf Copper finished its work, the offshore drilling projects had no greater value than before Gulf Copper started. This is the "logical limit" of the (g)(3) revenue exclusion.[5]

Of course, the rigs that Gulf Copper repairs and modifies are used by third parties to construct oil and gas wells, and oil and gas wells are improvements to real property. For this reason, the State does not challenge Findings of Fact 20: "Offshore drilling rigs are necessary and essential to the drilling of offshore oil and gas wells because the wells could not be drilled without the drilling rigs") or Finding of Fact 30 ("The labor and materials provided by Gulf Copper through its employees and subcontractors are necessary, essential, and integral to the construction

---

[5] While this part of the (g)(3) revenue exclusion is similar to the real-property project requirement in the third-sentence of subsection (i), there are differences. Subsection (i) does not contain the word "services." It refers to "labor or materials furnished *to*" a real-property project, rather than "services, labor or materials" provided "*in connection with*" such projects. Nevertheless, Gulf Copper's work does not qualify for the revenue exclusion even under the broader phrasing in subsection (g)(3). It is still too "remote or attenuated" to qualify. *See Titan Transp.* 433 S.W.3d at 638. The court of appeals' decision does not account for the use of different words and phrases in these two subsections.

… of oil and gas wells."). CR.298, 299 [App.2].

But just as narrow focus on necessity or indispensability would improperly broaden the statutory test under subsection (i), these findings are, as a matter of law, insufficient to pull the subcontractor payments into the (g)(3) revenue exclusion. The taxpayer's indispensability argument—which is really none other than a "but for," cause-in-fact argument—"proves too much." Undoubtedly, there are many necessary or essential preconditions—business organization, administrative services support, surveying, geoseismic testing, research—for oil wells and other real-property projects. And, no doubt, these and other necessary preconditions will themselves require the furnishing of labor or materials.

But the mere fact that the disputed labor or materials are in the causal chain leading up to the real-property project is not evidence supporting the (g)(3) revenue exclusion. Another precondition of the project would be a written drilling contract between the rig owner and the E&P company. Should the law firm that drafted the contract for the rig owner be able to exclude its expenses because the expenses were incurred "in connection with" the improvement of real property? Gulf

Copper is in the same position as the law firm, providing services to the rig owner antecedent to the drilling project and not providing any value to the drilling project itself.

**C. There is no evidence that the subcontractor payments constituted "flow-through funds that are mandated by contract to be distributed to other entities."**

Even if the Court rejects the State's primary contention and finds that the subcontractor payments were made in connection with the construction or improvements of real property, there must still be evidence that the payments were mandated by contract to be distributed to the subcontractors.

Gulf Copper's two biggest contracts with rig owners, the Pride and Helix contracts, involved two types of subcontractor labor – hourly and cost-plus.

Under the hourly labor provisions, employees of the subcontractor worked side-by-side with Gulf Copper employees, performing the same work. Gulf Copper paid these subcontractors a flat hourly rate. And under the Pride and Helix contracts, the rig owners paid Gulf Copper a higher flat hourly rate—paying the same rate for regular labor performed

by Gulf Copper employees and its subcontractors. 2.RR.110–113. 4.RR.104–05; PX1 at P00220 (Pride Contract) [App.9]; PX2 at P0072 (Helix contract). Indeed, with respect to regular labor, the Pride and Helix contracts said nothing at all about subcontractors.

But for the second type of subcontractor labor involving specialty services, the Pride and Helix contracts specified that payments were cost plus 15% (in the case of the Pride contract) and cost plus 20% (in the case of the Helix contract). PX1 at P00221 [App.9]; PX2 at P00073 [App.10]; 2.RR.112.[6]

At trial, the State conceded that $32.0 million in subcontractor payments—reflecting the specialty services governed by the cost-plus provisions in the Pride and Helix contracts—were flow-through funds mandated by contract to be distributed to the subcontractors. But the State continued to urge that the other payments—reflecting the hourly-rate subcontractors—were not flow-through funds.  With respect to those payments, no contract mandated that any customer payment for

---

[6] Gulf Copper also made subcontractor payments under six other contracts in addition to the Pride and Helix contracts. But none of those six contracts were cost-plus contracts. PX3, PX4, PX5, PX6, PX7, PX8.

labor be distributed to the subcontractors. The trial court and the court of appeals erred when they concluded these payments were nonetheless flow-through funds mandated by contract to be distributed to other entities. Opinion at *6.

Though Gulf Copper was contractually obligated to pay the subcontractors for "labor," it was not *contractually obligated* to *pass on or flow-through* customer payments to them. That makes all the difference under the plain language of the statute. Neither the court of appeals nor Gulf Copper pointed to any contractual mandate in the customer contracts or in the subcontracts that required Gulf Copper to share customer payments with its subcontractors.

When examining statutory text, the Code Construction Act mandates that the Court read words and phrases in context and construe them according to the rules of grammar and usage. Tex. Gov't Code Ann. § 311.011(a) (West 2013); *see also supra* at 11-12. The phrase "flow-through funds *that* are mandated by contract to be distributed to other entities" is a single unified requirement. The dependent clause "that are mandated by contract to be distributed to other entities" is an adjective

that specifies and limits the type of flow-through funds excludable from revenue.

The court of appeals' approach effectively reads out of the statute the requirement that a contract mandate that funds be distributed to other entities. Gulf Copper was not contractually obligated to mark-up anything or, for that matter, to do anything at all besides paying the subcontractors an hourly rate.

Although the court of appeals relied on *Titan Transp., LP v. Comb*s, 433 S.W.3d 625 (Tex. App.—Austin 2014, pet. denied), that case is readily distinguishable. There, the taxpayer had "contracts with its subcontractors that required [the taxpayer] to pay 84% of its gross receipts [from customers] to independent contractors." *Titan Transp.*, 433 S.W.3d at 630.

Alternatively, in the event of ambiguity, this statute is a tax exclusion, which like tax exemptions, must be construed strictly against Gulf Copper. *See Owens Corning v. Hegar*, 04-16-00211-CV, 2017 WL 1244444, at *3 (Tex. App.—San Antonio Apr. 5, 2017, pet. denied) (holding that the cost-of-goods-sold deduction is a tax exemption for the same reason).

## PRAYER

For these reasons, the court should grant the petition for review and upon further briefing on the merits, reverse and render judgment.

Respectfully submitted,

KEN PAXTON
Attorney General

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney
General

JAMES E. DAVIS
Deputy Attorney General for Civil
Litigation

*/s/ Jack Hohengarten*
JACK HOHENGARTEN
Tax Division Chief
State Bar No. 09812200
Tax Division MC 029
PO Box 12548
Austin, Texas 78711-2548
Tel: (512) 475-3503
Fax: (512) 478-4013
*Attorneys for Petitioners*

## CERTIFICATE OF COMPLIANCE

I certify the Petitioner's Petition for Review contains 4493 words, excluding portions exempted by Rule 9.4(i)(1).

/s/ Jack Hohengarten
JACK HOHENGARTEN

## CERTIFICATE OF SERVICE

I certify that on December 20, 2017, a copy of this document was served on all parties and counsel of record by email and eservice, as follows:

James F. Martens
Danielle V. Ahlrich
MARTENS, TODD, LEONARD & AHLRICH
301 Congress Ave., Ste. 1950
Austin, Texas 78701

Amanda G. Taylor
BECK REDDEN LLP
515 Congress Avenue
Suite 1900
Austin, Texas 78701

/s/ Jack Hohengarten
JACK HOHENGARTEN

No. 17-0894

## IN THE SUPREME COURT OF TEXAS

Glenn Hegar, Comptroller of Public Accounts of the State of
Texas and Ken Paxton, Attorney General of the State of Texas,
Petitioners,

v.

Gulf Copper and Manufacturing Corporation,
Respondent.

On Petition for Review
from the Third Court of Appeals at Austin, Texas
Appeal No. 03-16-00250-CV

## APPENDIX TO PETITIONERS' PETITION FOR REVIEW

KEN PAXTON
Attorney General of Texas

JEFF MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney
General

JAMES E. DAVIS
Deputy Attorney General for Civil
Litigation

JACK HOHENGARTEN
Tax Division Chief
State Bar No. 09812200
Tax Division
P.O. Box 12548; MC-029
Austin, Texas 78711-2548
TEL: (512) 475-3503
FAX: (512) 478-4013

*Counsel for Petitioners*

## APPENDIX TABLE OF CONTENTS

Tab

Final Judgment of the Trial Court…………………………………………….A

Findings of Fact and Conclusions of Law……………………………….B

Opinion and Judgment of the Third Court of Appeals……………….C

TEX. TAX CODE § 171.1012…………………………………………….....D-1

TEX. TAX CODE § 171.1011…………………………………………….....D-2

TEX. PROP. CODE § 53.001…………………………………………….....D-3

TEX. PROP. CODE § 53.021………………………………………....…….D-4

TEX. PROP. CODE § 53.023………………………………………….…….D-5

# APPENDIX A

CAUSE NO. D-1-GN-14-004620

| | | |
|---|---|---|
| GULF COPPER & MANUFACTURING CORPORATION, **Plaintiff** | § § § § § | IN THE DISTRICT COURT OF |
| v. | § § | |
| GLENN HEGAR COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS; AND KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS, **Defendants** | § § § § § § § | TRAVIS COUNTY, TEXAS 53rd JUDICIAL DISTRICT |

## FINAL JUDGMENT

During the week of February 1, 2016, the above-entitled matter was tried to the bench in the 201st District Court of Travis County, Texas. After considering the evidence, the briefing, the pleadings, and arguments of counsel, the Court orders that Plaintiff is entitled to a full refund of its franchise tax protest payment for report year 2009.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Defendants shall pay Plaintiff the full amount paid by Plaintiff under protest in this matter ($838,117.84), plus all statutory interest and costs as allowed by law. Each party shall bear its own attorney's fees. All relief not expressly granted herein is hereby denied. This judgment is a final disposition of all parties and claims.

SIGNED this 22nd day of February, 2016.

THE HONORABLE AMY CLARK MEACHUM
201st District Court,
Travis County, Texas

APPROVED AS TO FORM AND
SUBSTANCE:

By _Danielle Ahlrich_

**James F. Martens**
jmartens@textaxlaw.com
State Bar No. 13050720
**Danielle V. Ahlrich**
dahlrich@textaxlaw.com
State Bar No. 24059215
**Amanda G. Taylor**
ataylor@textaxlaw.com
State Bar No. 24045921
Martens, Todd, Leonard, Taylor & Ahlrich
301 Congress Ave., Suite 1950
Austin, Texas 78701
(512) 542-9898

Attorneys for Plaintiff

APPROVED AS TO FORM:

By

**Charles K. Eldred**
Charles.eldred@texasattorneygeneral.gov
State Bar No. 00793681
Assistant Attorney General,
Tax Division
P.O. Box 12548
Austin, Texas 78711-2548
(512) 475-1743

Attorney for Defendants

# APPENDIX B



CAUSE NO. D-1-GN-14-004620

| | | |
|---|---|---|
| GULF COPPER & MANUFACTURING CORPORATION, | § § § | IN THE DISTRICT COURT OF |
| Plaintiff | § | |
| | § | |
| v. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| GLENN HEGAR | § | |
| COMPTROLLER OF PUBLIC | § | |
| ACCOUNTS OF THE STATE OF TEXAS; | § | |
| AND KEN PAXTON, ATTORNEY | § | |
| GENERAL OF THE STATE OF TEXAS, | § | |
| Defendants | § | 53rd JUDICIAL DISTRICT |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Based on the evidence, the briefing, the pleadings, and arguments of counsel, the Court makes the following findings of fact and conclusions of law:

### I. Findings of Fact

1. Gulf Copper owns all of the outstanding shares of a subsidiary named Sabine Surveyors.

2. Sabine Surveyors is a limited partnership primarily engaged in the business of marine vessel surveying.

3. Gulf Copper and Sabine Surveyors share certain physical locations, customers and managerial staff. They also refer business to each other.

4. Gulf Copper and Sabine Surveyors are affiliated and engaged in a unitary business.

5. Gulf Copper and Sabine Surveyors are members of a combined group, which files combined franchise tax reports.

6. Gulf Copper serves as the reporting entity for the franchise tax combined group.

7. For franchise tax report year 2009 (the accounting period of May 1, 2007 to April 30, 2008), Gulf Copper, Sabine Surveyors, and others (hereinafter collectively referred to as "Gulf Copper") joined in the filing of combined franchise tax report.

8. Gulf Copper satisfied all procedural prerequisites to maintain a protest suit under Texas Tax Code Chapter 112.

9. Gulf Copper's customers are primarily rig owners and drilling contractors who use their offshore rigs to drill for oil and gas on behalf of exploration and production ("E&P") companies.

10. Gulf Copper is primarily engaged in the business of surveying, manufacturing, upgrading, and repairing offshore drilling rigs.

11. Gulf Copper provides everything necessary to satisfy the customer's work order, including all labor, materials, equipment, and supplies.

12. Gulf Copper repairs rigs by removing defective portions, manufacturing replacement components, and installing the replacement components onto the rigs. Gulf Copper also manufactures and installs new components for rigs that do not replace an existing component.

13. Gulf Copper's work is labor-intensive and requires specialized training and experience. Examples of Gulf Copper's employee and subcontractor labor includes: manufacturing (e.g., steel components, drain systems, and fuel systems); installation; welding; fitting; cutting; blasting, coating, and painting; hot work; analytical stress testing; and electrical and hydraulic work. Gulf Copper's work is complex, requiring precise measurements and several levels of inspection and compliance.

14. In performing its work through its employees and subcontractors, Gulf Copper furnishes materials, including steel, gasket materials, blasting medium, paint, and other industrial materials.

15. In completing its work, Gulf Copper utilizes all aspects and the entire breadth of its facility yards, whether the rig sits on the dry dock, in the yard, or in the water. This includes the lay down areas, the warehouses, the fabrication shops, the welding areas, and the stacking areas.

16. Gulf Copper's work enables the rigs (1) to meet and maintain the certification requirements imposed by classification societies, (2) to comply with governing regulations, and (3) to satisfy an exploration and production ("E&P") company's contractual requirements for a specific drilling project.

17. A rig cannot be used for drilling unless it is properly certified, compliant, and satisfies the contractual requirements for the project.

18. Gulf Copper's work increases the rig's value.

19. Rig owners do not hire Gulf Copper to repair or upgrade their rigs or manufacture new components unless they have a revenue-generating contract in place for the drilling of offshore oil and gas wells.

20. Offshore drilling rigs are necessary and essential to the drilling of offshore oil and gas wells because the wells could not be drilled without the drilling rigs.

21. Gulf Copper has elected, for federal income tax purposes, to use the accrual method of accounting. This method matches the costs incurred by Gulf Copper with the revenues generated by those expenses.

22. Gulf Copper performs its work using both employees and subcontractors.

23. Gulf Copper's customers often approve or require Gulf Copper's use of certain subcontractors to complete the work. The customers remain very involved throughout the project. They often have field representatives at Gulf Copper's facilities and monitor the specific deadlines by which the work must be completed.

24. Gulf Copper charges its customers for subcontractor work using a formula that is based upon Gulf Copper's actual cost of the subcontractor(s) plus a mark-up. Regardless of how the subcontractor is billed, Gulf Copper's resulting mark-up to the customer is generally between 15-20 percent.

25. When Gulf Copper's customers pay Gulf Copper for work performed by subcontractors, Gulf Copper retains the portion of the payment attributable to its mark-up (generally between 15-20 percent) and flows through the remainder of the customer's payment to the subcontractor.

26. The subcontractor payments flow from Gulf Copper's customer, through Gulf Copper, to Gulf Copper's subcontractors who performed the work for the customer.

27. The subcontractors are legal entities separate from Gulf Copper.

28. Gulf Copper's contractual mandates to distribute flow-through funds to its subcontractors are contained within its customer contracts, its contracts with the subcontractors, supporting invoices, work orders, purchase orders, and other accounting records. They are also embodied in the course of Gulf Copper's dealings with its customers and subcontractors.

29. Gulf Copper, through its employees and subcontractors, provides labor and materials in connection with the actual or proposed construction, or repair of improvements on real property; and to projects for the construction, improvement, repair, or industrial maintenance of real property.

30. The labor and materials provided by Gulf Copper through its employees and subcontractors are necessary, essential, and integral to the construction, improvement, repair, and industrial maintenance of oil and gas wells.

31. Gulf Copper's proper apportionment factor is .8808.

32. Gulf Copper manufactures, develops, improves, and installs tangible personal property for its customers.

33. Gulf Copper resells tangible personal property to its customers.

34. Gulf Copper sometimes sells the scrap metal generated by its rig repair work.

35. Gulf Copper owns tangible personal property that it sells in the ordinary course of business.

36. For report year 2009, Gulf Copper incurred expenses eligible to be included in the cost of goods sold subtraction in the amount of $152,116,964.

37. The categories, classifications, locations and amounts of the costs eligible to be included in the cost of goods sold subtraction are accurately stated in Exhibit 56.

38. Any finding of fact that is more properly characterized as a conclusion of law shall be considered a conclusion of law.

## II. Conclusions of Law

1. Gulf Copper consists of a combined group, including Gulf Copper, Sabine Surveyors and others, and this combined group is a single taxable entity for purposes of the Texas franchise tax.

2. Gulf Copper is entitled to exclude from its revenue $79,405,230 in subcontractor payments under Tex. Tax Code § 171.1011(g)(3).

3. Oil and gas wells constitute improvements on real property for purposes of Tex. Tax Code § 171.1011(g)(3).

4. Texas Tax Code § 171.1011(g)(3) does not require that the mandate for payment be contained in a customer contract or subcontract. The statutory mandate element is satisfied as long as the taxpayer is legally obligated by contract to pay a portion of the customer funds to the subcontractor.

5. Alternatively, Gulf Copper is entitled to include the $79,405,230 in subcontractor payments in its cost of goods sold subtraction under Tex. Tax Code § 171.1012.

6. Under Tex. Tax Code § 171.1055, Gulf Copper may not include receipts excluded from total revenue in either the numerator or the denominator of its apportionment calculation.

7. Gulf Copper properly excluded from the numerator and denominator of its apportionment factor its subcontractor payments totaling $79,405,230.

8. Gulf Copper properly calculated its franchise tax due amount using an apportionment factor of .8808.

9. Gulf Copper owns goods as required by the first sentence of Tex. Tax Code § 171.1012(i).

10. Gulf Copper qualifies for the cost of goods sold subtraction under the second sentence of Tex. Tax Code § 171.1012(i) and as defined by § 171.1012(a)(1).

11. Gulf Copper qualifies for the cost of goods sold subtraction under the third sentence of Tex. Tax Code § 171.1012(i).

12. Oil and gas wells constitute real property for purposes of Tex. Tax Code § 171.1012(i).

13. The limitations imposed by the Comptroller upon Gulf Copper's cost of goods sold calculation violate Tex. Tax Code § 171.1012.

14. Gulf Copper is entitled to include the costs of Sabine Surveyors in its cost of goods sold subtraction, as allowed by Tex. Tax Code § 171.1012(g)-(h), (c)-(f).

15. As a qualifying owner of goods, Gulf Copper properly included each of the costs shown on Exhibit 56 as costs of goods sold allowed for subtraction under Tex. Tax Code § 171.1012(g)-(h), (c)-(f).

16. In addition to the revenue exclusion stated in Conclusion of Law No. 2, Gulf Copper is entitled to claim a cost of goods sold subtraction in the amount of $72,711,734 for franchise tax report year 2009, as set forth in Exhibit 56.

17. Alternatively, Gulf Copper is entitled to include its $79,405,230 in subcontractor payments in its cost of goods sold subtraction for a total subtraction of $152,116,964 for report year 2009, as set forth in Exhibit 56.

18. Any conclusion of law that is more properly characterized as a finding of fact shall be considered a finding of fact.

SIGNED this 11th day of March, 2016.

THE HONORABLE AMY CLARK MEACHUM
201st District Court,
Travis County, Texas

# APPENDIX C

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-16-00250-CV

**Glenn Hegar, Comptroller of Public Accounts of the State of Texas; and
Ken Paxton, Attorney General of the State of Texas, Appellants**

**v.**

**Gulf Copper and Manufacturing Corporation, Appellee**

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT
NO. D-1-GN-14-004620, HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

## O P I N I O N

Gulf Copper and Manufacturing Corporation sued Glenn Hegar, Comptroller of Public Accounts of the State of Texas, and Ken Paxton, Attorney General of the State of Texas (collectively, the State), seeking a refund of franchise taxes that Gulf Copper paid under protest. *See* Tex. Gov't Code §§ 403.201-.221 (governing protest suit after payment under protest); Tex. Tax Code §§ 112.001-.156 (governing taxpayer suits). Gulf Copper asserted that the State erroneously denied it a revenue exclusion it had claimed for payments made to its subcontractors during the relevant tax year.[1] In the alternative, Gulf Copper asserted it was entitled to deduct the subcontractor

---

[1] *See* Act of May 19, 2006, 79th Leg., 3d C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 10 (amended 2013) (current version at Tex. Tax Code § 171.1011(g)(3)) (excluding certain "flow-through funds" from taxpayer's "total revenue").

payments as "cost of goods sold" (COGS).[2] Gulf Copper also asserted that the State erroneously excluded certain costs Gulf Copper had included in its calculation of its COGS deduction, resulting in a smaller COGS deduction and, correspondingly, Gulf Copper's owing additional franchise taxes. Following a bench trial, the trial court concluded that Gulf Copper was entitled to a revenue exclusion for the subcontractor payments or, alternatively, was permitted to include the subcontractor payments in its COGS deduction. The trial court also concluded that Gulf Copper was entitled to deduct all of the costs it had included in its original COGS calculation. The court rendered judgment ordering the State to pay Gulf Copper $838,117.84, the entire amount it had paid under protest, plus statutory interest and costs allowed by law. On appeal, the State asserts that the trial court erred in its conclusions regarding both the revenue exclusion and the COGS deduction. We agree with the trial court that Gulf Copper was entitled to claim a revenue exclusion for the subcontractor payments. However, because on this record we cannot uphold the trial court's findings regarding the amount of Gulf Copper's COGS deduction, we will reverse the trial court's judgment and remand the cause to the trial court for further proceedings.

## DISCUSSION

This Court has previously provided overviews of the current Texas franchise-tax scheme, originally enacted in 2006, which assesses franchise taxes against a taxable entity's "taxable

---

[2] *See* Act of May 19, 2006, 79th Leg., 3d C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 8 (amended 2013) (current version at Tex. Tax Code § 171.101(a)) (allowing taxpayer to elect to deduct COGS from total revenue); Act of May 19, 2006, 79th Leg., 3d C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 13-16 *as amended by* Act of June 15, 2007, 80th Leg., ch. 1282, §§ 14, 15, 2007 Tex. Gen. Laws 4282, 4290-91 (amended 2013) (current version at Tex. Tax Code § 171.1012) (governing calculation of COGS deduction).

2

margin." *See Titan Transp., LP v. Combs*, 433 S.W.3d 625, 627-29 (Tex. App.—Austin 2014, pet. denied); *Combs v. Newpark Res., Inc.*, 422 S.W.3d 46, 47-48 (Tex. App.—Austin 2013, no pet.). Under the current franchise-tax scheme, franchise taxes are assessed against a taxable entity's "taxable margin." Tex. Tax Code § 171.002(a). The franchise-tax statute has been substantively amended several times since its enactment, and the provisions applicable to this case are those that were in effect on January 1, 2009.[3] Under that version of the franchise-tax statute, the taxable entity first calculates its "total revenue" in the manner directed by Tax Code section 171.1011. *See id*. § 171.1011 (determination of total revenue). In general, total revenue is income reported to the federal Internal Revenue Service less various categories of revenue that the statute specifies are to be excluded, excepted, deducted, or otherwise limited. *Id.* For example, all taxpayers may deduct certain flow-through funds, while only taxable entities in select industries are permitted to exclude other types of flow-through funds. *Compare id.* § 171.1011(f), (g) (flow-through-funds exclusions) *with id.* (g-1), (g-3), (g-4) (flow-through-funds exclusions for specific industries); *see also In re Nestle USA, Inc.*, 387 S.W.3d 610, 615 (Tex. 2012) (discussing franchise-tax scheme). "A manifest purpose of excluding 'flow-through funds' is to except from taxation gross receipts that do not constitute actual gain or income to the taxpayer." *Titan Transp.*, 433 S.W.3d at 628.

After calculating total revenue, the taxpayer computes its "taxable margin" by first determining its "margin." *See* Tex. Tax Code § 171.101(a)(1) ("The taxable margin of a taxable entity is computed by . . . determining the taxable entity's margin."). The "margin" is the lesser of

---

[3] Citations in this opinion will be to the current version of the Tax Code when intervening amendments are not relevant to the disposition of the issues on appeal.

3

(1) 70% of the taxable entity's total revenue or (2) the taxable entity's total revenue minus, at the entity's election, either cost of goods sold, as determined under section 171.1012 (the COGS calculation) or compensation, as determined under section 171.1013 (the compensation calculation). *See* Act of May 19, 2006, 79th Leg., 3d C.S., ch.1, § 5, 2006 Tex. Gen. Laws 1, 8, *as amended by* Act of June 15, 2007, 80th Leg., ch. 1282, § 11, 2007 Tex. Gen. Laws 4282, 4287 (amended 2013) (current version at Tex. Tax Code 171.101).[4]  After applicable deductions have been taken, "taxable margin" is determined by apportioning the adjusted revenue between in-state and out-of-state business and, except for E-Z computation filers, subtracting any other allowable deductions.  *Id.* §§ 171.101(a)(2), (3), .1016(b)(2), (c).  The franchise-tax obligation is determined by multiplying the "taxable margin" by the applicable tax rate.  *Id.* § 171.002.

### *Nature of Gulf Copper's Business Activities*[5]

Gulf Copper is a corporation primarily engaged in the business of surveying, manufacturing, upgrading, and repairing offshore drilling rigs.  Gulf Copper's work enables the drilling rigs to (1) obtain and maintain the certification requirements imposed by marine classification societies;[6] (2) comply with regulations, both state and federal, applicable to offshore drilling rigs

---

[4]  Not relevant to this case is the option to use the E-Z computation method to determine margin for taxable entities whose total revenue is $20 million or less.  *See* Tex. Tax Code § 171.1016 (E-Z computation method and rate for taxpayers with no more than $20 million in total revenue).

[5]  The following description of Gulf Copper's business activities is derived from unchallenged findings of fact made by the trial court and from testimony elicited at trial, which, unless otherwise indicated, is undisputed.

[6]  A marine classification society is a non-governmental organization that establishes and maintains technical standards for the construction and operation of marine vessels.  Steven Hale, Gulf Copper's Chairman and Chief Executive Officer, testified that the International Association of

and their operations;[7] and (3) meet the requirements imposed by contracts entered into between exploration and production companies and the drilling rigs' owners related to specific drilling projects.[8] The drilling rigs are delivered to Gulf Copper's facility where Gulf Copper performs the work to satisfy the requirements of the particular classification society certifying the drilling rig, the other regulatory authorities involved, the drilling rig's owner representative, and often a representative from the exploration and production company for whose project the drilling will be performed. Gulf Copper repairs rigs by removing defective portions, manufacturing replacement components, and installing the replacement components on the rigs. Gulf Copper also manufactures and installs new components for rigs that do not replace an existing component.

Gulf Copper also owns all the outstanding shares of a subsidiary named Sabine Surveyors, a limited partnership primarily engaged in the business of marine vessel surveying. Hale

---

Classification Societies promulgates rules and regulations that offshore drilling rigs have to meet to operate safely and in an environmentally sound manner. According to Hale, the classification standards are met through a regimen of inspections and surveys on a prescribed, periodic basis to ensure the integrity and safety of the vessel. That a rig meets classification rules and standards is of critical importance to both an exploration and production company considering using a particular rig on its project and to the underwriter who insures the drilling rig.

[7] Hale testified that offshore drilling rigs and their operations are subject to regulations promulgated by entities such as the United States Coast Guard, the Environmental Protection Agency, the International Maritime Organization, and the "Bureau of Offshore Environmental Management." We assume that the last reference was to the Bureau of Ocean Energy Management, one of three independent entities created when the federal Minerals Management Service was reorganized in the wake of the Deepwater Horizon oil spill. The Bureau's mission is "managing development of the nation's offshore resources in an environmentally and economically responsible way." *See The Reorganization of the Former MMS*, BOEM.GOV, http://www.boem.gov/Reorganization/ (last visited June 15, 2017).

[8] Hale testified that individual wells have "different requirements relative to the equipment on the rig."

testified that Sabine Surveyors inspects marine vessels, including offshore drilling rigs, and cargo. Surveys are also conducted after a drilling rig is involved in a collision with another vessel while it is offshore and the owner or underwriter requests an inspection to determine the extent of the damage. According to Hale, in certain circumstances Sabine Surveyors must "separate itself from" Gulf Copper's shipyard activities because it might be deemed a conflict of interest for Sabine Surveyors to refer a job for which Sabine Surveyors represents the drilling rig's underwriter to Gulf Copper. Hale testified that Sabine Surveyors also prepares "desk appraisals" of drilling rigs for use by entities with a financial interest in a rig.

### *Gulf Copper's Franchise-Tax Dispute*

The underlying tax protest concerns Gulf Copper's 2009 franchise-tax report. Gulf Copper excluded from its total gross revenue $79,405,230 in "flow-through" payments to subcontractors, which, along with other exclusions amounting to $163,303,[9] reduced its total revenue from $173,875,422 to $94,306,889. Gulf Copper then elected to use the COGS deduction to calculate its margin, subtracting $70,396,219 from its total revenue to arrive at a margin of $23,910,670. Gulf Copper calculated its apportionment factor at 0.8808, application of which resulted in a taxable margin of $21,060,518. Accordingly, Gulf Copper reported a franchise-tax obligation of $210,605.18—1% of its taxable margin—which it timely paid in full.

In claiming a revenue exclusion of $79,405,230, Gulf Copper relied on former section 171.1011(g)(3) of the franchise-tax statute, which provided:

---

[9] The Comptroller does not dispute that the $163,303 qualified for a revenue exclusion.

6

A taxable entity shall exclude from its total revenue, to the extent [reported to the federal IRS as income], only the following flow-through funds that are mandated by contract to be distributed to other entities:

....

(3) subcontracting payments handled by the taxable entity to provide services, labor, or materials in connection with the actual or proposed design, construction, remodeling, or repair of improvements on real property or the location of the boundaries of real property.

Act of May 19, 2006, 79th Leg., 3d C.S., ch.1, § 5, 2006 Tex. Gen. Laws 1, 10 (amended 2013) ("the (g)(3) revenue exclusion" or "former section 171.1011(g)(3)"). After conducting an audit, however, the Comptroller determined that the $79,405,230 in payments to subcontractors did not meet the requirements for the (g)(3) revenue exclusion. Instead, the Comptroller determined that the subcontractor payments should be considered in the calculation of Gulf Copper's COGS deduction. The Comptroller also audited the amount that Gulf Copper had calculated as its COGS deduction and significantly pared down the expenses it believed could properly be included in the COGS calculation. In essence, the Comptroller concluded that only costs either directly or indirectly related to "fabrication" of goods could properly be included in the calculation of Gulf Copper's COGS deduction.

After concluding its audit, the Comptroller determined that Gulf Copper had: (1) $163,303 in allowed revenue exclusions,[10] and (2) a total COGS deduction of $77,140,769. As a consequence of moving the subcontractor payments from the (g)(3) revenue exclusion, Gulf

_____

[10] This number is the difference between the total flow-through revenue exclusions Gulf Copper originally took minus the $79,405,230 in subcontractor payments the Comptroller determined were not properly excluded from revenue as qualifying flow-through funds under the (g)(3) revenue exclusion.

7

Copper's apportionment factor increased from 0.8808 to 0.9353. The Comptroller thus calculated

that Gulf Copper had an additional franchise tax obligation for franchise-tax report year 2009 of

$692,626.66. Gulf Copper paid the assessed deficiency plus interest (a total of $838,118.00) under

protest. *See* Tex. Tax Code § 112.051. Along with its protest payment, Gulf Copper submitted

a letter to the Comptroller outlining its reasons for claiming the (g)(3) revenue exclusion for

subcontractor payments and explaining its method of calculating its COGS deduction. Gulf Copper

subsequently filed the underlying lawsuit, seeking a refund of all amounts paid under protest. Gulf

Copper maintained that it was entitled to take the (g)(3) revenue exclusion based on the nature of its

business activities and its contractual obligations to make the excluded payments to subcontractors

who were performing activities in connection with oil and gas well construction and improvement.

Gulf Copper asserted that the subcontractors were engaged in providing services, labor, and materials

in the form of manufacturing, constructing, developing, improving, creating, and installing

component parts for offshore drilling rigs used to construct, remodel, or repair oil and gas wells,

which it contended are improvements on real property. Gulf Copper claimed that the payments to

its subcontractors satisfied the statutory prerequisites for claiming the (g)(3) revenue exclusion

because (1) the payments were mandated by contract, (2) to be paid to an entity other than Gulf

Copper (the taxable entity), and (3) the funds paid to the subcontractors were for the provision of

"services, labor, or materials in connection with the actual or proposed . . . construction, remodeling,

remediation, or repair of improvements on real property." *See id.* § 171.1011(g)(3).[11]

---

[11] Relatedly, Gulf Copper asserted that, by refusing to allow Gulf Copper to claim the subcontractor payments as a revenue exclusion, the Comptroller had erroneously increased Gulf Copper's apportionment factor from 0.8808 to 0.9353.

Gulf Copper also asserted that the Comptroller had improperly limited the costs that could be included in the calculation of its COGS deduction. Gulf Copper challenged the Comptroller's conclusion that none of Gulf Copper's expenses could be included in COGS pursuant to Texas Tax Code subsection 171.1012(i). This subsection provides that "[a] taxable entity furnishing labor or materials to a project for the construction, improvement, remodeling, repair, or industrial maintenance [] of real property is considered to be an owner of that labor or materials and may include the costs, as allowed by [section 171.1012], in the computation of cost of goods sold." *Id.* § 171.1012(i); *see Hegar v. CGG Veritas Servs. (U.S.), Inc.*, No. 03-14-00713-CV, 2016 WL 1039054, at *3 (Tex. App.—Austin Mar. 9, 2016, no pet.) (mem. op.) (taxable entity that provides "labor and materials" to project for the construction or improvement of real property, which includes oil and gas wells, is entitled to include costs of that labor and materials, as allowed by section 171.1012, in computation of its cost of goods sold and deduct that amount from its total revenue to calculate its "margin" for franchise-tax purposes); *Newpark Res.*, 422 S.W.3d at 54-57 (holding that, under Texas Tax Code subsection 171.1012(i), certain labor expenses of subsidiary that does not itself produce "goods" but that does supply labor to projects for construction of real property improvements may be included in combined entity's COGS calculation, and that term "labor" in statute encompasses wide range of labor expenses, including those associated with activities that might also be described as "services"). The Comptroller had concluded that Gulf Copper did not have any expenses that could be included in the calculation of the COGS deduction by virtue of being costs of labor or materials furnished to a project for construction or improvement of real property under section 171.1012(i) and, consequently, it could only include in its COGS calculation the direct and some

9

indirect costs of acquiring or producing "goods."[12] *See* Tex. Tax Code § 171.1012(c), (d), (f). In the Comptroller's view, each of Gulf Copper's facilities[13] was engaged in both fabrication and non-fabrication activities and only the costs of labor and materials associated with the fabrication activities were "costs of acquiring or producing goods" that could properly be included in calculating the COGS deduction.

At trial, the evidence concerning Gulf Copper's business operations was essentially undisputed. The parties joined issue, however, on whether the subcontractor payments qualified for the (g)(3) revenue exclusion as payments made "to provide services, labor, or materials in connection with the actual or proposed design, construction, remodeling, remediation, or repair of improvements on real property." *See id.* § 171.1011(g)(3). The Comptroller took the position that the work the subcontractors performed was "two steps away" from actual or proposed construction of improvements on real property and therefore was too "remote or attenuated" from any actual or proposed construction to meet the "in connection with" requirement to qualify for the (g)(3) revenue exclusion. In the alternative, the Comptroller argued that if the subcontractor payments met the "in connection with" requirement, only a portion of those payments ($32 million of the $79.4 million total) met the requirement that they be "mandated by contract" to be distributed to other entities. *See*

---

[12] "Goods" are defined as "real or tangible personal property sold in the ordinary course of business of a taxable entity." Tex Tax. Code § 171.1012(a)(1). "Tangible personal property" does not include intangible property or services. *Id.* § 171.1012(a)(3)(B).

[13] Gulf Copper's facilities include yards in Galveston, Port Arthur, and Corpus Christi. Gulf Copper also owns Sabine Surveyors, which the Comptroller determined provided only services and thus did not incur any costs related to acquiring or producing goods that could be included in the calculation of Gulf Copper's COGS deduction.

*id.* § 171.1011(g). The parties also continued to be in sharp disagreement about the correct method for calculating Gulf Copper's COGS deduction.

After a three day bench trial, the trial court rendered judgment in Gulf Copper's favor and ordered the State to refund the entire amount paid under protest. The trial court also made the following relevant findings of fact:

> FOF 2: Sabine Surveyors is a limited partnership primarily engaged in the business of marine vessel surveying.
>
> FOF 9: Gulf Copper's customers are primarily rig owners and drilling contractors who use their offshore rigs to drill for oil and gas on behalf of exploration and production ("E&P") companies.
>
> FOF 10: Gulf Copper is primarily engaged in the business of surveying, manufacturing, upgrading, and repairing offshore drilling rigs.
>
> FOF 12: Gulf Copper repairs rigs by removing defective portions, manufacturing replacement components, and installing the replacement components onto the rigs. Gulf Copper also manufactures and installs new components for rigs that do not replace an existing component.
>
> FOF 15: In completing its work, Gulf Copper utilizes all aspects and the entire breadth of its facility yards, whether the rig sits on the dry docks, in the yard, or in the water. This includes the lay down areas, the warehouses, the fabrication shops, the welding areas, and the stacking areas.
>
> FOF 16: Gulf Copper's work enables the rigs (1) to meet and maintain the certification requirements imposed by classification societies, (2) to comply with governing regulations, and (3) to satisfy an exploration and production ("E&P") company's contractual requirements for a specific drilling project.
>
> FOF 17: A rig cannot be used for drilling unless it is properly certified, compliant, and satisfies the contractual requirements for the project.
>
> FOF 19: Rig owners do not hire Gulf Copper to repair or upgrade their rigs or manufacture new components unless they have a revenue-generating contract in place for the drilling of offshore oil and gas wells.

11

FOF 20: Offshore drilling rigs are necessary and essential to the drilling of offshore oil and gas wells because the wells could not be drilled without the drilling rigs.

The State then perfected this appeal. The State's three appellate issues reduce to a challenge to the trial court's judgment on the grounds that (1) the trial court erroneously agreed that Gulf Copper could exclude from its revenue the $79.4 million in subcontractor payments pursuant to the (g)(3) revenue exclusion and (2) the trial court erred by concluding that Gulf Copper's COGS calculation was correct, leading to an oversized COGS deduction, regardless of whether the subcontractor payments were considered in the COGS calculation rather than excluded from revenue.

## DISCUSSION

### *Eligibility of Subcontractor Payments for the (g)(3) Revenue Exclusion*

The (g)(3) revenue exclusion requires that a taxpayer exclude from total revenue certain flow-through funds "that are mandated by contract to be distributed to other entities."[14] During franchise tax year 2009, Gulf Copper used subcontractors to perform a significant portion of the work it did for its customers. There were essentially two types of subcontractors working for

---

[14] Effective January 1, 2014, section 171.1011(g)(3) was amended to require the exclusion of "flow-through funds that are mandated by contract *or subcontract* to be distributed to other entities" and that are "*subcontracting payments made under a contract or subcontract entered into by the taxable entity* to provide services, labor, or materials in connection with the actual or proposed design, construction, remodeling, remediation, or repair of improvements on real property or the location of the boundaries of real property." Tex. Tax Code § 171.1011(g)(3) (emphases added). The bill analysis for this enactment indicates that the amendment was proposed in response to the Comptroller's interpretation of section 171.1011(g)(3) as "allowing an entity to exclude subcontracting payments only when the entity has a contract in place that states that a specific portion of the work will be subcontracted" because the Comptroller's interpretation was not consistent with the practices of the affected industry. Senate Research Ctr., Bill Analysis, Tex. H.B. 2766, 83d Leg., R.S. 2013.

Gulf Copper. First, there were "labor" subcontractors that provided workers who performed the same types of tasks performed by Gulf Copper's employees. Hale testified that Gulf Copper used a significant number of workers provided by "labor" subcontractors in franchise tax year 2009 because there was both (1) an increased volume of work due to increased offshore drilling activity and (2) displacement of a portion of Gulf Copper's regular workforce caused by hurricanes in the area. According to Hale, Gulf Copper was required to look outside its geographical region and locate subcontractors who could provide welders, fitters, and other workers to work alongside Gulf Copper's employees. The "labor" subcontractors charged Gulf Copper a rate of $35 to $38 per hour per worker.[15] Gulf Copper in turn billed its customers for work performed by the "labor" subcontractors' workers at a rate of $54 per hour per worker. Gulf Copper included as "flow-through funds" in its (g)(3) revenue exclusion only the $35 to $38 per hour per worker it paid the "labor" subcontractor supplying the workers. The remaining $16 to $19 per hour Gulf Copper received from its customers for work done by workers provided by the "labor" subcontractors was not included in the (g)(3) revenue exclusion.

The second type of subcontractor was "outside specialty" subcontractors hired to provide workers to perform certain specialized tasks such as finishing out the accommodations on a rig or doing electrical work. The "outside specialty" subcontractors were, at times, designated to be used for certain tasks by the customers, who had preexisting relationships with those subcontractors. Gulf Copper charged its customers for the work done by the "outside specialty" subcontractors an amount 15 to 20 percent greater than the amount the "outside specialty" subcontractor charged

---

[15] The record does not reflect what portion of the hourly rate that the "labor" subcontractors charged Gulf Copper for its workers was ultimately paid to the workers themselves.

13

Gulf Copper. Gulf Copper included as "flow-through funds" in its (g)(3) revenue exclusion only the amount it paid to the "outside specialty" subcontractor and did not include the additional revenue it received from its customers as a result of the 15 to 20 percent upcharge.

On appeal the State agrees, as it did at trial, that the amounts paid to the "outside specialty" subcontractors constitute flow-through funds mandated by contract to be distributed to other entities and may be included in the (g)(3) revenue exclusion. With respect to payments to the "labor" subcontractors, however, the State maintains that because Gulf Copper's contracts with its customers do not "mandate that their payments flow through Gulf Copper to the subcontractors providing the regular labor" those payments do not qualify for the (g)(3) revenue exclusion.

The State's position is contrary to the plain language of the statute and to this Court's previous holding in *Titan Transportation*. The statute requires Gulf Copper to exclude from its total revenue calculation certain flow-through funds that were mandated by contract to be distributed to other entities. *See* Tex. Tax Code § 171.1011(g). As this Court held in *Titan Transportation*, the "mandate" may be contained in either a contract with the customer or in a contract with the subcontractor. *See Titan Transp.*, 433 S.W.3d at 641. An agreement between Gulf Copper and a "labor" subcontractor constitutes a contract. The evidence and exhibits admitted at trial, including contracts with the "labor" subcontractors who supplied the individuals performing the regular labor, establish that Gulf Copper was obligated by those contracts to pay the "labor" subcontractors for that labor.[16] Thus, Gulf Copper was contractually obligated to pass on to the "labor"

---

[16] For example, Gulf Copper's Master Service Agreement with Maxum Industries, LLC, a "labor" subcontractor, contains the following provision:

[Gulf Copper] shall pay [Maxum Industries, LLC], subject to [Gulf Copper's]

14

subcontractors—other entities of the type referenced in the statute—a fixed portion of the customer's $54 per hour per worker payment, typically between $35 and $38 per hour per worker. Gulf Copper's contracts with its "labor" subcontractors satisfy "the statutory requirement that qualifying payments be contractually mandated to someone other than the taxpayer." *Id.*[17]

The Comptroller also maintains that the $79,405,230 in subcontractor payments do not qualify for the (g)(3) revenue exclusion because the work done in exchange for those payments was too remote or attenuated to constitute the provision of "services, labor, or materials in connection with the actual or proposed design, construction, remodeling, remediation, or repair of improvements on real property." Tex. Tax Code § 171.1011(g)(3). Specifically, the Comptroller argues that, although Gulf Copper's work on the rigs adds value to the rigs, that work does not itself add value to any actual or proposed construction of oil wells, which it concedes are improvements on real property. The Comptroller points out that Gulf Copper does not have contracts with and is not liable to the exploration and production companies that actually drill the oil wells and does not

---

verification that [Maxum Industries, LLC] has complied with all terms and conditions of this Agreement and any applicable Purchase Order. In the event [Gulf Copper] should dispute any part of an invoice, undisputed portions thereof shall be paid; and upon resolution of all disputed items, a supplemental invoice will be submitted to [Gulf Copper] for payment.

An email exchange between principals from Gulf Copper and Maxum Industries, LLC provides the hourly rates Gulf Copper was to pay for welders, fitters, superintendents, and leadmen, ranging from $36.50 to $37.50 per hour.

[17] As this Court noted in *Titan Transportation*, "an evident purpose of the (g)(3) revenue exclusion is to prevent double taxation of funds that are not truly gain or income to the taxpayer." *Titan Transp., LP v. Combs*, 433 S.W.3d 625, 641 (Tex. App.—Austin 2014, pet. denied). That purpose is served when, as here, the taxpayer excludes from its revenue the portion of payments received that it must pass on to another entity.

15

perform any work on the oil wells themselves. According to the Comptroller, the fact that Gulf Copper is "two steps removed" from the construction of the improvement on real property itself (the oil well) precludes it from falling within the "logical limit" the Legislature intended to impose on the phrase "in connection with" used in the statute.

This Court has previously described the phrase "in connection with" as one "of intentional breadth," but not without "logical limit." *Titan Transp.*, 433 S.W.3d at 637. The Court delineated the contours of the "in connection with" requirement as follows:

> As used in former section 171.1011(g)(3), the phrase "in connection with" can only be read as requiring some reasonable nexus between the services, labor, and materials for which the taxpayer pays a subcontractor and "the actual or proposed design, construction, remodeling, or repair of improvements on real property or the location of boundaries of real property." [] Given its context, the only plausible interpretation of the "in connection with" language employed in the (g)(3) revenue exclusion is that there must be a reasonable—i.e., more than tangential or incidental—relationship between the activities delineated in the statute and the services, labor, or materials for which the subcontractors receive payment. . . . The critical inquiry [] is whether the services, labor, or materials provided have a reasonable connection to construction, remodeling, design, or repair work on real property.

*Id.* at 638-39. The inquiry, then, is whether the activities performed by the subcontractors for Gulf Copper have a reasonable connection to the construction of oil wells, which we have held, and the parties do not dispute, are improvements on real property. *See Newpark Res.*, 422 S.W.3d at 53 (drilling of oil and gas well is "project for construction and improvement of real property").

The evidence at trial showed that the workers supplied to Gulf Copper by the "labor" subcontractors performed essentially the same activities as Gulf Copper's employees in its yards. Thus, those workers were engaged in activities that resulted in the offshore drilling rigs'

16

(1) obtaining and maintaining the certification requirements imposed by marine classification societies, (2) complying with regulations, both state and federal, applicable to offshore drilling rigs and their operations, and (3) meeting the requirements imposed by contracts entered into between exploration and production companies and the drilling rigs' owners related to specific drilling projects. In our view, it is evident that doing work on offshore drilling rigs—equipment that is undisputedly integral to drilling offshore wells—that renders them able to perform the drilling services required to drill a particular oil well is an activity that is reasonably connected to the construction of that oil well. Thus, at least part of the work done by the subcontractors plainly meets the (g)(3) revenue exclusion's requirement that it be "in connection with" construction of an improvement on real property.

Whether performing work that makes a rig compliant with general requirements imposed by marine classification societies or with state and federal regulations generally applicable to offshore drilling rigs and their operations presents a closer question. Arguably, readying an offshore drilling rig for use on offshore drilling projects generally might not be sufficiently related to the "actual or proposed" construction of an improvement to real property to meet the (g)(3) revenue exclusion requirement. Likewise, it could be argued that a drilling rig's compliance with rules and regulations that permit it to operate offshore generally is incidental or tangential to the "actual or proposed" construction of a particular offshore well. We need not, however, address such arguments here because the Comptroller's position is that *all* subcontractor payments were for work too attenuated to qualify for the (g)(3) revenue exclusion by virtue of the work being "two steps" away from the actual drilling of oil wells. The State made no distinctions among the

17

subcontractors' various activities but rather took the position that, as a matter of law, Gulf Copper

was not entitled to take the (g)(3) revenue exclusion *at all*. Thus, the State has failed to preserve the

argument that while Gulf Copper may have been permitted to claim a (g)(3) revenue exclusion for

some of its subcontractor payments, other subcontractor payments were for work too attenuated to

an actual or proposed project to qualify. On this record, there is sufficient evidence to support the

trial court's conclusion that Gulf Copper was entitled to include the $79,405,230 in payments to

subcontractors as flow-through funds falling within the (g)(3) revenue exclusion.

Having concluded that the subcontractor payments qualified for the (g)(3) revenue

exclusion, we turn now to Gulf Copper's calculation of its COGS deduction to determine whether

the trial court's finding that Gulf Copper was entitled to claim a COGS deduction of $72,711,734

when calculating its margin for franchise tax purposes was supported by factually sufficient evidence.

### Gulf Copper's Calculation of the COGS Deduction

The COGS deduction is calculated in accordance with Texas Tax Code section

171.1012. *See* Tex. Tax Code § 171.1012 (determination of cost of goods sold). Section 171.1012

defines "goods" to mean "real or tangible personal property sold in the ordinary course of business

of a taxable entity" and provides that "tangible personal property" does not include services. *Id*.

§171.1012(a)(1), (3)(B)(iii). Section 171.1012 provides that an entity may take a COGS deduction

for "all direct costs of acquiring or producing the goods," including labor costs, "costs of materials

that are an integral part of" the goods, "handling costs, including costs attributable to processing,

assembling, repackaging, and inbound transportation costs," storage costs, and costs of renting,

leasing, maintaining, and repairing equipment, facilities, or real property directly used for production

18

of the goods. *Id.* § 171.1012(c).[18] A taxable entity may also take a COGS deduction for post-production direct costs, including storage and handling provided for by subsection (c), and for indirect or administrative overhead costs allocable to the acquisition or production of goods, up to four percent of the entity's total indirect or administrative overhead costs. *Id.* § 171.1012(d), (f).[19] Specifically excluded from COGS eligibility are the cost of renting or leasing equipment, facilities, or real property not used for the production of "goods," "selling costs, including employee expenses related to sales," "distribution costs, including outbound transportation costs," and rehandling costs. *Id.* § 171.1012(e). Also excluded are advertising costs, idle facility expenses, bidding costs, interest, income taxes, strike expenses, officer compensation, and compensation paid to undocumented workers. *Id.*

A COGS deduction is generally available only to the taxable entity that owns the "goods" in question. *Id.* § 171.1012(i). The Legislature has, however, "extended access to the deduction in limited circumstances." *See Hegar v. Sunstate Equip. Co.*, No. 03-15-00738-CV,

---

[18] Subsection (c) also includes the cost of materials consumed in producing the goods; depreciation, depletion, and amortization associated with and necessary to the production of the goods; research and design activities directly related to the production of the goods; geophysical costs to locate mineral-producing property; taxes paid for materials or services that are direct production costs; the cost of producing or acquiring electricity sold; and "a contribution to a partnership in which the taxable entity owns an interest that is used to fund activities, the costs of which would otherwise be treated as cost of goods sold of the partnership, but only to the extent that those costs are related to goods distributed to the taxable entity as goods-in-kind in the ordinary course of production activities rather than being sold." Tex. Tax Code § 171.1012(c).

[19] Subsection (d) also includes insurance for facilities or equipment directly used to produce the goods; insurance on the produced goods; deterioration, obsolescence, spoilage, and abandonment of the goods; pre-production direct costs for property held for future production, including storage and handling provided for by subsection (c); utilities directly used in producing the goods; quality control costs; and licensing or franchise costs. *Id.* § 171.1012(d).

2017 WL 279602, at *3 (Tex. App.—Austin Jan. 20, 2017, pet. filed) (mem. op.). Relevant to this case is that "an entity furnishing labor or materials to a project for the construction, improvement, remodeling, repair, or industrial maintenance . . . of real property is considered to be an owner of that labor and materials and may include the costs, as allowed by [section 171.1012], in the cost of goods sold." *Id.* "The analytic framework for determining whether a particular 'labor cost' is includable as a cost of goods sold under subsection 171.1012(i) [] requires determining whether the particular activity is an essential and direct component of the 'project for the construction . . . of real property.'" *CGG Veritas*, 2016 WL 1039054, at *3 (citing *Newpark Res.*, 422 S.W.3d at 56). This Court adopted this analytic framework to address the circumstance that (1) the terms "labor" and "service" are not defined in the statute, (2) "services" are specifically excluded from the definition of "tangible personal property," (3) "labor" and "services" are not mutually exclusive, and (4) certain labor expenses associated with activities that might also be described as a "service" fall within the wide range of labor expenses that section 171.1012(i) permits a taxable entity that furnishes labor to a project for construction or improvement of real property to deduct. *See Newpark Res.*, 422 S.W.3d at 55-57; *see also CGG Veritas*, 2016 WL 1039054, at *3. Thus, provided the activity is "an essential and direct component" of the project for construction or improvement of real property, the associated costs may, through application of subsection 171.1012(i), be included in the COGS deduction even if the activity might be in the nature of a "service." *See Newpark Res.*, 422 S.W.3d at 56 (trial court could reasonably have concluded that removal and disposal of waste material was labor furnished to project for construction of oil and gas well based on trial testimony that this activity was essential to continue drilling of oil and gas well).

20

In calculating its COGS deduction, Gulf Copper did not engage in a cost-by-cost analysis of each expense to determine whether it fit into one of the categories of costs the statute provides may properly be included in the calculation of cost of goods sold, *see* Tex. Tax Code § 171.1012(c), (d), (f), nor did it employ the analytic framework described above to determine whether its particular activities that involved furnishing labor to a project for construction or improvement of real property (as opposed to its activities that produced "goods") were "an essential and direct component" of a particular project, *see id.* § 171.1012(i). Rather, Gulf Copper took the position that it is a taxable entity "eligible" to take a COGS deduction both because it is the owner of goods (i.e., tangible personal property sold in the ordinary course of its business) and because it furnishes labor and materials for the construction or improvement of real property. Then, relying on subsection 171.1012(h), which provides that "[a] taxable entity shall determine its cost of goods sold, except as otherwise provided by this section, in accordance with the methods used on the federal income tax return on which the report under this chapter is based," *id*. § 171.1012(h), Gulf Copper used as a "starting point" for its COGS calculation the trial balance (a summary of all transactions for the accounting year) that it used to prepare its federal income tax return. Gulf Copper explained: "When Gulf Copper applied its federal income tax methods to its transactional data (revenues generated and costs incurred), the result represented Gulf Copper's COGS for federal income tax purposes. [] For federal income tax purposes, Gulf Copper qualifies a [sic] producer of goods and, thus, must calculate its federal COGS pursuant to the accounting method imposed by Internal Revenue Code Section 236A."[20] From the dollar amount of the COGS deduction it

---

[20] Gulf Copper states that "it appears our Legislature used the corresponding treasury regulation (C.F.R. § 1.236A-1) as an outline to draft the COGS statute."

21

calculated for federal income tax purposes, Gulf Copper excluded costs that it determined constituted

costs expressly excluded from the state COGS deduction by subsections 171.1012(e) and (f). *Id.*

§ 171.1012(e) (list of costs in relation to taxable entity's goods that may not be included in COGS

calculation); (f) (taxable entity may include only four percent of taxable entity's total indirect or

administrative overhead costs in COGS calculation). Gulf Copper stated that it:

> did not parse the costs associated with its integrated business activities because doing
> so would violate (1) its federal income tax methods; (2) the economic realities of
> Gulf Copper's business (*i.e.*, it takes all of the activities and their associated costs to
> generate the taxable revenue); (3) its accounting system (which captures a host of
> financial data necessary to operate the business but does not segregate its single
> integrated activity–rig repair–and its costs into component steps; (4) its combined
> group status; and (5) the Legislature's goal of taxing margin (because diluting Gulf
> Copper's ability to deduct its costs generates a tax on revenue).

Thus, Gulf Copper's failure to examine, on an item-by-item basis, whether a cost could properly be

included in the COGS calculation under the Texas Tax Code was based on (1) its belief that it was

required by section 171.1012(h) to start with its federal COGS calculation and (2) the logistical

difficulties, given its business model and its accounting systems, of performing that task.

We first consider whether Texas Tax Code subsection 171.1012(h) directs a taxable

entity to use its federal income tax COGS deduction as the starting point for its calculation of the

Texas franchise tax COGS deduction.[21] Texas Tax Code subsection 171.1012(h) provides:

---

[21] This presents a question of statutory construction that we review de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective in construing statutes is to give effect to the Legislature's intent and, ordinarily, "'the truest manifestation' of what lawmakers intended is what they enacted." *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 632 (Tex. 2008) (quoting *Alex Sheshunoff Mgmt. Servs. L.P. v. Johnson*, 209 S.W.3d 644, 651-52 (Tex. 2006)). The language emerging from the legislative process "constitutes the law, and when a statute's words are

22

A taxable entity shall determine its cost of goods sold, except as otherwise provided by [section 171.1012], in accordance with the methods used on the federal income tax return on which the report under this chapter is based. This subsection does not affect the type or category of cost of goods sold that may be subtracted under [section 171.1012].

Tex. Tax Code § 171.1012(h). Contrary to Gulf Copper's assertion, this provision does not constitute a directive to use the amount of the taxable entity's federal income tax COGS deduction as a starting point for calculating its state franchise tax COGS deduction and to thereby avoid considering whether each particular cost corresponds to a subtraction from total revenue permitted by section 171.1012. The text of this subsection plainly states that it "*does not affect the type or category* of cost of goods sold that may be subtracted" under section 171.1012. *Id.* (emphasis added).

Thus, the plain language of subsection (h) confirms that a taxable entity is permitted to include in the calculation of its COGS deduction only the types of expenses outlined in subsections 171.1012(c), (d), and (f). Indeed, these subsections are prefaced by subsection (b), which expressly provides that "a taxable entity that elects to subtract cost of goods sold for the purpose of computing its taxable margin *shall* determine the amount of that cost of goods sold *as*

---

unambiguous and yield but one interpretation, 'the judge's inquiry is at an end.'" *Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 635 (Tex. 2013) (quoting *Johnson*, 209 S.W.3d at 651-52)). We give an unambiguous statute its plain meaning without resorting to rules of construction or extrinsic aids. *Id.*; *see also Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 635, 637 (Tex. 2010) (branding such reliance "improper" because "[w]hen a statute's language is clear and unambiguous, it is inappropriate to resort to rules of construction or extrinsic aids to construe the language"). Rules of construction such as agency deference and strict construction of tax statutes against the taxing authority are employed only when a statute is ambiguous. *See TracFone Wireless, Inc. v. Commission on State Emergency Commc'ns*, 397 S.W.3d 173, 182 (Tex. 2013) ("The reach of an *ambiguous* tax statute must be construed "strictly against the taxing authority and liberally for the taxpayer." (emphasis added) (quoting *Morris v. Houston Indep. Sch. Dist.*, 388 S.W.3d 310, 313 (Tex. 2012) (per curiam))).

*provided by this section*." *Id.* § 171.1012(b) (emphases added). If the Legislature intended for a taxable entity to calculate its state franchise tax COGS deduction by simply subtracting certain expenses from its federal income tax COGS deduction it would not have needed to include the detailed and extensive description of the costs eligible for inclusion in the state COGS deduction that are found in subsections 171.1012(c), (d), and (f). *See id.* § 171.1012(c), (d), (f). Gulf Copper's interpretation of subsection (h) would essentially render subsections (c) and (d) superfluous. While Gulf Copper's interpretation of subsection (h) may have appeal when that subsection is viewed in isolation, well settled rules of statutory interpretation require us to "examine the entire act to glean its meaning" and "to presume that 'the entire statute is intended to be effective.'" *Meritor Auto., Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 90 (Tex. 2001) (quoting Tex. Gov't Code § 311.021(2)). And we may not interpret a statute in a way that renders any part of it meaningless. *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 390 (Tex. 2014).

Under well established rules of statutory interpretation, the proper interpretation of subsection 171.1012(h) is that it speaks to the specific accounting methods the taxable entity uses in determining the amount of its cost of goods sold and mandates that the taxable entity use the same accounting method it used when preparing its federal tax return.[22] A review of the statute as a whole

---

[22] An entity's chosen accounting method dictates how the entity's transactions are recorded in its financial books. For example, an entity using the cash-basis accounting method records its expenses in its accounts when it actually pays the cash and books revenues when it actually receives payment. An entity using the accrual accounting method records revenue when the transaction is completed—e.g., when the work specified in a contract between the entity and its customer is completed—instead of when it actually receives payment. The entity handles expenses in the same manner by recording them when they have been incurred rather than when payment is actually made. *See* E. McGruder Faris, Jr., Accounting for Lawyers 75-84 (3d ed. 1975). The cash method and the accrual method are two of the methods a taxpayer may use to compute its taxable income for federal

24

confirms this conclusion. Subsection 171.1012(b) requires that a taxable entity that elects to subtract cost of goods sold for the purpose of computing its taxable margin "determine *the amount* of that cost of goods sold as provided by [section 171.1012]," whereas subsection (h) requires that a taxable entity "determine its cost of goods sold [] *in accordance with the methods* used on the federal income tax return." *Cf.* Tex. Tax Code § 171.1012(b), *with id.* § 171.1012(h). Thus, subsection 171.1012(b) addresses how to calculate the amount of the COGS deduction while subsection (h) clarifies that the taxable entity must use the same accounting method—either cash basis or accrual—when determining whether a particular COGS-deduction-eligible expense should be included in that tax year's COGS calculation.[23]

We also observe that by using its federal income tax COGS deduction as the "starting point," Gulf Copper offered insufficient evidence that the expenses included in that calculation actually correspond to the types and categories of expenses permitted to be included in the calculation of a taxable entity's state franchise tax COGS deduction pursuant to section 171.1012. To the extent the federal COGS calculation includes expenses that are not eligible for the state COGS deduction, such as costs that do not qualify under the state statute as direct costs of "acquiring

---

tax purposes. *See* 26 U.S.C. § 446(c) (taxpayer may compute taxable income under cash receipts and disbursement method, accrual method, any other method permitted by statute, or any combination of foregoing methods permitted under regulations prescribed by Secretary of Treasury).

[23] The main difference between accrual and cash basis accounting is the timing of when revenue and expenses are recognized. Under the cash method, the taxable entity generally deducts expenses in the tax year in which it actually paid them. Under the accrual method, expenses may be deducted when they are incurred. *See* 26 C.F.R. § 1.466-1 (general rule for methods of accounting). Thus, an expense that might be recognized and included in the COGS deduction calculation in a particular tax year when using the accrual accounting method might not qualify for inclusion in the same tax year when using the cash basis accounting method.

25

or producing" the "goods," the result of using that calculation as a starting point is the overinclusion of expenses in the calculation of the COGS deduction for state franchise tax purposes. Gulf Copper's method for calculating its state COGS deduction fails to provide evidence that the expenses included in its starting point (the federal COGS deduction) are deductions that are also permitted to be included in the calculation of the COGS deduction under the state statute.

Also unpersuasive is Gulf Copper's argument that its interpretation permits it to avoid the "incredibly burdensome" task of identifying which of the expenses of its integrated business activities actually constitute a cost of "acquiring or producing" a "good" such that it is eligible to be included in the calculation of its COGS deduction. Our interpretation of the Texas Tax Code is not guided by the accounting systems used by taxable entities. *Cf. Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 637 (Tex. 2013) (statutory determinations in tax disputes should reflect economic realities of *transactions* at issue). The supreme court has explained that it has never suggested that, "in the guise of considering the economic realities or essence of the transaction, courts were authorized to impose an entirely new requirement" that is not found in the language of the tax statute. *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 627 n.8 (Tex. 2013). Rather, we must take the Legislature "at its word and giv[e] the statute its plain meaning." *Id.* at 627. A taxable entity is offered three alternative methods for determining its margin under the Texas franchise tax statute: (1) 70% of total revenue from the entity's total business; (2) subtracting from total revenue the costs of goods sold as determined under section 171.1012; or (3) subtracting from total revenue compensation as determined under section 171.1013. *See* Tex. Tax Code § 171.101(a). Gulf Copper's choice was to subtract from its calculation of total revenue its COGS deduction. The

26

burden on Gulf Copper of calculating the proper amount of that deduction may be an indication that one of the different methods of determining its taxable margin is the better choice. The burden on the entity making the calculation cannot dictate the applicability or the amount of the deduction allowed; we must enforce the statute as written.

The plain language of section 171.1012 confirms that calculating the COGS deduction for Texas franchise tax purposes requires a cost-by-cost analysis to determine whether the cost fits one of the types and categories eligible for inclusion in the calculation. "[T]he Cost of Goods Sold includes 'all direct costs of acquiring or producing goods,' some indirect costs like insurance, utilities, and quality control, and up to 4% of other 'indirect or administrative overhead costs.'" *In re Nestle USA*, 387 S.W.3d at 615 (citations omitted). Because Gulf Copper's calculation of its COGS deduction did not conform to the statute, we reverse the trial court's finding that for report year 2009, Gulf Copper incurred expenses eligible to be included in the cost of goods sold subtraction in the amount of $152,116,964[24] as lacking factually sufficient evidentiary support.[25] We also reverse the finding that "[t]he categories, classifications, locations and amounts of the costs eligible to be included in the cost of goods subtraction are accurately stated in Exhibit 56."

---

[24] This number assumes that the subcontractor payments are not excluded from total revenue but, instead, are included in the COGS deduction.

[25] Although the State did not frame its appellate issue as a factual sufficiency challenge, the Comptroller has acknowledged that Gulf Copper is entitled to take a COGS deduction of some amount. The State requested that, in the event this Court does not accept the Comptroller's method of calculating Gulf Copper's COGS deduction, we remand the case to the trial court for further proceedings to determine Gulf Copper's COGS deduction by application of a proper interpretation of section 171.1012 to the evidence before the trial court.

27

Our analysis of the COGS deduction issue does not end here, however, because the State likewise presented the trial court with a flawed view of what qualifies for inclusion in Gulf Copper's calculation of its COGS deduction, as explained below.

***The Comptroller's Calculation of Gulf Copper's COGS Deduction***

The Comptroller performed its own calculation of Gulf Copper's COGS deduction as follows. First, the Comptroller determined that Gulf Copper had no expenses that qualified for the COGS deduction by virtue of subsection 171.1012(i). That is, it concluded that none of Gulf Copper's costs were associated with labor and materials "furnished to a project for the construction, improvement, remodeling, repair, or industrial maintenance of real property." *See* Tex. Tax Code § 171.1012(i). Thus, the Comptroller did not consider whether any of Gulf Copper's costs were for labor and materials furnished to a qualifying project or were associated with activities that might otherwise be viewed as "services" but might nevertheless be eligible for inclusion in the COGS deduction calculation because they were an "essential and direct component of the 'project for construction . . . of real property.'" *See id.*; *CGG Veritas*, 2016 WL 1039054, at *3; *Newpark Res.*, 422 S.W.3d at 56. Next, the Comptroller determined that only activities involving "fabrication" of items sold to Gulf Copper's customers should be included in the COGS calculation. Because Gulf Copper's accounting records did not differentiate between the costs of what the Comptroller deemed to be "fabrication" and what it deemed to be simply "installation" or other non-production related activities,[26] the Comptroller decided to use Gulf Copper's labor records as a proxy for all of its costs

---

[26] The Legislature recently amended the definition of "production" contained in Texas Tax Code section 171.1012(a). *See* Act of May 19, 2017, 85th Leg., R.S., ch. 377, § 1, 2017 Tex.

28

and asked Gulf Copper to review its labor costs to come up with a percentage to apply to each of Gulf Copper's facilities that would represent the percentage of its costs that were related to "fabrication." The Comptroller assigned the following percentages for each of Gulf Copper's facilities: (1) 50% at Port Arthur, (2) 50% at Galveston, and (3) 5% at Corpus Christi. The Comptroller then reviewed each type of Gulf Copper's expenses for each facility and, if the Comptroller concluded that the type of expense was one that was generally eligible for inclusion in the COGS calculation it allowed it on the percentage basis assigned to the facility where the activity generating the expense occurred. For example, the Comptroller allowed 50% of the labor costs associated with the Port Arthur facility because labor is identified in subsection 171.1012(c) as a cost of goods sold, but only to the extent it is a direct cost of acquiring or producing a good. Having determined that 50% of the Port Arthur yard activities were "fabrication," the Comptroller determined that 50% of the labor costs at that facility were a direct cost of producing a good. The Comptroller analyzed all of Gulf Copper's expenses in this general manner unless it was apparent that the expense was entirely related to producing goods, such as cost of materials. The Comptroller

Sess. Law Serv. ch. 377 (to be codified as an amendment to Tex. Tax Code § 171.1012(a)(2)). The amendment provides that, effective September 1, 2017, "'production' means construction, manufacture, development, mining, extraction, improvement, creation, raising, or growth." *Id.* The pre-amendment definition provides that production "includes construction, installation, manufacture, development, mining, extraction, improvement, creation, raising, or growth." The amended version replaces the word "includes" with the word "means" and eliminates "installation" from the definition of "production." The Legislature's note to the amendment states that the amendment "is a clarification of existing law and does not imply that Section 171.1012, Tax Code, before the amendment made by this Act may be construed as inconsistent with Section 171.1012, Tax Code, as amended by this Act." Act of May 19, 2017, 85th Leg., R.S., ch. 377, § 2, 2107 Tex. Sess. Law Serv. ch. 377.

did not allow any of the costs incurred by Sabine Surveyors because it determined that this entity performed only services.[27]

The trial court concluded that "[t]he limitations imposed by the Comptroller upon Gulf Copper's cost of goods sold calculation violate Tex. Tax Code § 171.1012." We agree. The Comptroller's calculation of Gulf Copper's COGS deduction is inconsonant with section 171.1012 in two ways. First, we do not agree with the Comptroller that none of Gulf Copper's expenses qualify for inclusion in its COGS calculation by virtue of subsection 171.1012(i). For example, Gulf Copper presented evidence at trial that, to some extent, Gulf Copper's employees provided labor and materials to projects for improvement of real property (drilling oil wells). The Comptroller was obligated to consider to what extent the activities of Gulf Copper's employees were essential and direct components of those specific projects. *See CGG Veritas*, 2016 WL 1039054, at *3. Sabine Surveyors also performed activities that, while constituting activities that might be described as a "service," are an "essential and direct component" of a project for construction of real property. Such activities include conducting surveys of rigs in order to ensure compliance with requirements specific to a particular drilling project. Other of Sabine Surveyors' activities, such as performing vessel surveys for underwriters, might be so attenuated that the costs of those activities would not constitute the cost of furnishing labor and materials *to* a project. Sabine Surveyors' costs should have been analyzed on a cost-by-cost basis to determine which of those costs met the requirement that they be integral, essential, and direct components of the offshore drilling process and which

_____

[27] Implicit in the 0% assigned to Sabine Surveyors is the Comptroller's determination that none of its costs could be included in Gulf Copper's COGS calculation by virtue of subsection 171.1012(i).

30

might be "too far removed from the construction, improvement, remodeling, repair, or industrial maintenance of real property to qualify for the cost-of-goods-sold deduction under section 171.1012(i)." *Newpark Res.*, 422 S.W.3d at 57.

Second, the Comptroller did not calculate the COGS deduction using a cost-by-cost analysis but, rather, developed percentages that it then applied to disallow and remove certain costs from the COGS deduction. This methodology is contrary to the cost-by-cost analysis required to determine whether a certain cost fits into a type or category identified in section 171.1012. The Comptroller's percentages were derived by using labor costs as a proxy for other costs and, consequently, there is an insufficient basis for the Comptroller's allocation of costs as deductible direct costs of producing goods.

Applying a proper construction of section 171.1012, the trial court's findings that Gulf Copper was entitled to include the entire $152,116,964 amount of its costs in the calculation of its COGS deduction is erroneous as a matter of law. Gulf Copper did, however, present some evidence, and the Comptroller does not dispute, that it was entitled to take a COGS deduction and exclude from its taxable margin a significant amount of its costs. The trial court correctly found that the limitations the Comptroller placed on Gulf Copper's cost of goods sold calculation were contrary to section 171.1012 for the reasons stated above. The Comptroller's calculation may not serve as the basis for determining Gulf Copper's taxable margin or, consequently, the amount of any refund to which it may be entitled. Further proceedings are therefore required to correctly calculate Gulf Copper's COGS deduction.

31

## CONCLUSION

For the reasons stated in this opinion, we conclude that, on this record, Gulf Copper was entitled to include the entire $79,405,230 of subcontractor payments in its (g)(3) revenue exclusion. We also conclude that (1) factually insufficient evidence supports the trial court's finding that Gulf Copper was entitled to include the entire $152,116,964 of its costs in its COGS deduction and (2) the Comptroller's calculation of that deduction is incorrect as a matter of law. Consequently, we reverse the trial court's judgment ordering the State to pay Gulf Copper the full amount it paid under protest and remand the cause to the trial court for further proceedings to determine the exact amount of refund to which Gulf Copper is entitled.

_____

Scott K. Field, Justice

Before Chief Justice Rose, Justices Field and Bourland

Reversed and Remanded

Filed:  August 11, 2017

32

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## JUDGMENT RENDERED AUGUST 11, 2017

## NO. 03-16-00250-CV

**Glenn Hegar, Comptroller of Public Accounts of the State of Texas; and Ken Paxton, Attorney General of the State of Texas, Appellants**

**v.**

**Gulf Copper and Manufacturing Corporation, Appellee**

## APPEAL FROM THE 201ST DISTRICT COURT OF TRAVIS COUNTY BEFORE CHIEF JUSTICE ROSE, JUSTICES FIELD AND BOURLAND REVERSED AND REMANDED -- OPINION BY JUSTICE FIELD

This is an appeal from the judgment signed by the trial court on February 22, 2016. Having reviewed the record and the parties' arguments, the Court holds that there was reversible error in the judgment. Therefore, the Court reverses the trial court's judgment and remands the case to the trial court for further proceedings. Each party shall pay the costs of appeal incurred by that party, both in this Court and the court below.

# APPENDIX D-1

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
  Tax Code (Refs & Annos)
    Title 2. State Taxation (Refs & Annos)
      Subtitle F. Franchise Tax (Refs & Annos)
        Chapter 171. Franchise Tax (Refs & Annos)
          Subchapter C. Determination of Taxable Margin; Allocation and Apportionment

V.T.C.A., Tax Code § 171.1011

§ 171.1011. Determination of Total Revenue from Entire Business

Effective: January 1, 2014

Currentness

(a) In this section, a reference to an Internal Revenue Service form includes a variant of the form. For example, a reference to Form 1120 includes Forms 1120-A, 1120-S, and other variants of Form 1120. A reference to an Internal Revenue Service form also includes any subsequent form with a different number or designation that substantially provides the same information as the original form.

(b) In this section, a reference to an amount reportable as income on a line number on an Internal Revenue Service form is the amount entered to the extent the amount entered complies with federal income tax law and includes the corresponding amount entered on a variant of the form, or a subsequent form, with a different line number to the extent the amount entered complies with federal income tax law.

(c) Except as provided by this section, and subject to Section 171.1014, for the purpose of computing its taxable margin under Section 171.101, the total revenue of a taxable entity is:

  (1) for a taxable entity treated for federal income tax purposes as a corporation, an amount computed by:

    (A) adding:

      (i) the amount reportable as income on line 1c, Internal Revenue Service Form 1120;

      (ii) the amounts reportable as income on lines 4 through 10, Internal Revenue Service Form 1120; and

      (iii) any total revenue reported by a lower tier entity as includable in the taxable entity's total revenue under Section 171.1015(b); and

    (B) subtracting:

(i) bad debt expensed for federal income tax purposes that corresponds to items of gross receipts included in Subsection (c)(1)(A) for the current reporting period or a past reporting period;

(ii) to the extent included in Subsection (c)(1)(A), foreign royalties and foreign dividends, including amounts determined under Section 78 or Sections 951-964, Internal Revenue Code;

(iii) to the extent included in Subsection (c)(1)(A), net distributive income from a taxable entity treated as a partnership or as an S corporation for federal income tax purposes;

(iv) allowable deductions from Internal Revenue Service Form 1120, Schedule C, to the extent the relating dividend income is included in total revenue;

(v) to the extent included in Subsection (c)(1)(A), items of income attributable to an entity that is a disregarded entity for federal income tax purposes; and

(vi) to the extent included in Subsection (c)(1)(A), other amounts authorized by this section;

(2) for a taxable entity treated for federal income tax purposes as a partnership, an amount computed by:

(A) adding:

(i) the amount reportable as income on line 1c, Internal Revenue Service Form 1065;

(ii) the amounts reportable as income on lines 4, 6, and 7, Internal Revenue Service Form 1065;

(iii) the amounts reportable as income on lines 3a and 5 through 11, Internal Revenue Service Form 1065, Schedule K;

(iv) the amounts reportable as income on line 17, Internal Revenue Service Form 8825;

(v) the amounts reportable as income on line 11, plus line 2 or line 45, Internal Revenue Service Form 1040, Schedule F; and

(vi) any total revenue reported by a lower tier entity as includable in the taxable entity's total revenue under Section 171.1015(b); and

(B) subtracting:

(i) bad debt expensed for federal income tax purposes that corresponds to items of gross receipts included in Subsection (c)(2)(A) for the current reporting period or a past reporting period;

(ii) to the extent included in Subsection (c)(2)(A), foreign royalties and foreign dividends, including amounts determined under Section 78 or Sections 951-964, Internal Revenue Code;

(iii) to the extent included in Subsection (c)(2)(A), net distributive income from a taxable entity treated as a partnership or as an S corporation for federal income tax purposes;

(iv) to the extent included in Subsection (c)(2)(A), items of income attributable to an entity that is a disregarded entity for federal income tax purposes; and

(v) to the extent included in Subsection (c)(2)(A), other amounts authorized by this section; or

(3) for a taxable entity other than a taxable entity treated for federal income tax purposes as a corporation or partnership, an amount determined in a manner substantially equivalent to the amount for Subdivision (1) or (2) determined by rules that the comptroller shall adopt.

(d) Subject to Section 171.1014, a taxable entity that is part of a federal consolidated group shall compute its total revenue under Subsection (c) as if it had filed a separate return for federal income tax purposes.

(e) A taxable entity that owns an interest in a passive entity shall exclude from the taxable entity's total revenue the taxable entity's share of the net income of the passive entity, but only to the extent the net income of the passive entity was generated by the margin of any other taxable entity.

(f) A taxable entity shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), flow-through funds that are mandated by law or fiduciary duty to be distributed to other entities, including taxes collected from a third party by the taxable entity and remitted by the taxable entity to a taxing authority.

(g) A taxable entity shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), only the following flow-through funds that are mandated by contract or subcontract to be distributed to other entities:

(1) sales commissions to nonemployees, including split-fee real estate commissions;

(2) the tax basis as determined under the Internal Revenue Code of securities underwritten; and

(3) subcontracting payments made under a contract or subcontract entered into by the taxable entity to provide services, labor, or materials in connection with the actual or proposed design, construction, remodeling, remediation, or repair of improvements on real property or the location of the boundaries of real property.

(g-1) A taxable entity that is a lending institution shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), proceeds from the principal repayment of loans.

(g-2) A taxable entity shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), the tax basis as determined under the Internal Revenue Code of securities and loans sold.

(g-3) A taxable entity that provides legal services shall exclude from its total revenue:

(1) to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), the following flow-through funds that are mandated by law, contract, or fiduciary duty to be distributed to the claimant by the claimant's attorney or to other entities on behalf of a claimant by the claimant's attorney:

(A) damages due the claimant;

(B) funds subject to a lien or other contractual obligation arising out of the representation, other than fees owed to the attorney;

(C) funds subject to a subrogation interest or other third-party contractual claim; and

(D) fees paid an attorney in the matter who is not a member, partner, shareholder, or employee of the taxable entity;

(2) to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), reimbursement of the taxable entity's expenses incurred in prosecuting a claimant's matter that are specific to the matter and that are not general operating expenses; and

(3) $500 per pro bono services case handled by the attorney, but only if the attorney maintains records of the pro bono services for auditing purposes in accordance with the manner in which those services are reported to the State Bar of Texas.

(g-4) A taxable entity that is a pharmacy cooperative shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), flow-through funds from rebates from pharmacy wholesalers that are distributed to the pharmacy cooperative's shareholders. A taxable entity that provides a pharmacy network shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), reimbursements, pursuant to contractual agreements, for payments to pharmacies in the pharmacy network.

(g-5) A taxable entity that is a qualified live event promotion company shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), a payment made to an artist in connection with the provision of a live entertainment event or live event promotion services.

(g-6) A taxable entity that is a qualified destination management company as defined by Section 151.0565 shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), payments made to other persons to provide services, labor, or materials in connection with the provision of destination management services as defined by Section 151.0565.

<Text of (g-7) effective until January 1, 2018>

(g-7) A taxable entity that is a qualified courier and logistics company shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), subcontracting payments made by the taxable entity to nonemployee agents for the performance of delivery services on behalf of the taxable entity. For purposes of this subsection, "qualified courier and logistics company" means a taxable entity that:

(1) receives at least 80 percent of the taxable entity's annual total revenue from its entire business from a combination of at least two of the following courier and logistics services:

(A) expedited same-day delivery of an envelope, package, parcel, roll of architectural drawings, box, or pallet;

(B) temporary storage and delivery of the property of another entity, including an envelope, package, parcel, roll of architectural drawings, box, or pallet; and

(C) brokerage of same-day or expedited courier and logistics services to be completed by a person or entity under a contract that includes a contractual obligation by the taxable entity to make payments to the person or entity for those services;

(2) during the period on which margin is based, is registered as a motor carrier under Chapter 643, Transportation Code, and if the taxable entity operates on an interstate basis, is registered as a motor carrier or broker under the unified carrier registration system, as defined by Section 643.001, Transportation Code, during that period;

(3) maintains an automobile liability insurance policy covering individuals operating vehicles owned, hired, or otherwise used in the taxable entity's business, with a combined single limit for each occurrence of at least $1 million;

(4) maintains at least $25,000 of cargo insurance;

(5) maintains a permanent nonresidential office from which the courier and logistics services are provided or arranged;

(6) has at least five full-time employees during the period on which margin is based;

(7) is not doing business as a livery service, floral delivery service, motor coach service, taxicab service, building supply delivery service, water supply service, fuel or energy supply service, restaurant supply service, commercial moving and storage company, or overnight delivery service; and

(8) is not delivering items that the taxable entity or an affiliated entity sold.

<Text of (g-7) effective January 1, 2018>

(g-7) A taxable entity that is a qualified courier and logistics company shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), subcontracting payments made by the taxable entity to nonemployee agents for the performance of delivery services on behalf of the taxable entity. For purposes of this subsection, "qualified courier and logistics company" means a taxable entity that:

(1) receives at least 80 percent of the taxable entity's annual total revenue from its entire business from a combination of at least two of the following courier and logistics services:

(A) expedited same-day delivery of an envelope, package, parcel, roll of architectural drawings, box, or pallet;

(B) temporary storage and delivery of the property of another entity, including an envelope, package, parcel, roll of architectural drawings, box, or pallet; and

(C) brokerage of same-day or expedited courier and logistics services to be completed by a person or entity under a contract that includes a contractual obligation by the taxable entity to make payments to the person or entity for those services;

(2) during the period on which margin is based, is registered as a motor carrier under Chapter 643, Transportation Code, and if the taxable entity operates on an interstate basis, is registered as a motor carrier or broker under the motor vehicle registration system established under 49 U.S.C. Section 14504a or a similar federal registration program that replaces that system during that period;

(3) maintains an automobile liability insurance policy covering individuals operating vehicles owned, hired, or otherwise used in the taxable entity's business, with a combined single limit for each occurrence of at least $1 million;

(4) maintains at least $25,000 of cargo insurance;

(5) maintains a permanent nonresidential office from which the courier and logistics services are provided or arranged;

(6) has at least five full-time employees during the period on which margin is based;

(7) is not doing business as a livery service, floral delivery service, motor coach service, taxicab service, building supply delivery service, water supply service, fuel or energy supply service, restaurant supply service, commercial moving and storage company, or overnight delivery service; and

(8) is not delivering items that the taxable entity or an affiliated entity sold.

(g-8) A taxable entity that is primarily engaged in the business of transporting aggregates shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), subcontracting payments made by the taxable entity to independent contractors for the performance of delivery services on behalf of the taxable entity. In this subsection, "aggregates" means any commonly recognized construction material removed or extracted from the earth, including dimension stone, crushed and broken limestone, crushed and broken granite, other crushed and broken stone, construction sand and gravel, industrial sand, dirt, soil, cementitious material, and caliche.

(g-10) A taxable entity that is primarily engaged in the business of transporting barite shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), subcontracting payments made by the taxable entity to nonemployee agents for the performance of transportation services on behalf of the taxable entity. For purposes of this subsection, "barite" means barium sulfate (BaSO4), a mineral used as a weighing agent in oil and gas exploration.

(g-11) A taxable entity that is primarily engaged in the business of performing landman services shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), subcontracting payments made by the taxable entity to nonemployees for the performance of landman services on behalf of the taxable entity. In this subsection, "landman services" means:

(1) performing title searches for the purpose of determining ownership of or curing title defects related to oil, gas, or other related mineral or petroleum interests;

(2) negotiating the acquisition or divestiture of mineral rights for the purpose of the exploration, development, or production of oil, gas, or other related mineral or petroleum interests; or

(3) negotiating or managing the negotiation of contracts or other agreements related to the ownership of mineral interests for the exploration, exploitation, disposition, development, or production of oil, gas, or other related mineral or petroleum interests.

(h) If the taxable entity belongs to an affiliated group, the taxable entity may not exclude payments described by Subsection (f), (g), (g-1), (g-2), (g-3), or (g-4) that are made to entities that are members of the affiliated group.

(i) Except as provided by Subsection (g), a payment made under an ordinary contract for the provision of services in the regular course of business may not be excluded.

(j) Any amount excluded under this section may not be included in the determination of cost of goods sold under Section 171.1012 or the determination of compensation under Section 171.1013.

(k) A taxable entity that is a professional employer organization shall exclude from its total revenue payments received from a client for wages, payroll taxes on those wages, employee benefits, and workers' compensation benefits for the covered employees of the client.

(l) For purposes of Subsection (g)(1):

(1) "Sales commission" means:

(A) any form of compensation paid to a person for engaging in an act for which a license is required by Chapter 1101, Occupations Code; or

(B) compensation paid to a sales representative by a principal in an amount that is based on the amount or level of certain orders for or sales of the principal's product and that the principal is required to report on Internal Revenue Service Form 1099-MISC.

(2) "Principal" means a person who:

(A) manufactures, produces, imports, distributes, or acts as an independent agent for the distribution of a product for sale;

(B) uses a sales representative to solicit orders for the product; and

(C) compensates the sales representative wholly or partly by sales commission.

(m) A taxable entity shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), dividends and interest received from federal obligations.

(m-1) A taxable entity that is a management company shall exclude from its total revenue reimbursements of specified costs incurred in its conduct of the active trade or business of a managed entity, including "wages and cash compensation" as determined under Sections 171.1013(a) and (b).

(n) Except as provided by Subsection (o), a taxable entity that is a health care provider shall exclude from its total revenue:

(1) to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), the total amount of payments the health care provider received:

(A) under the Medicaid program, Medicare program, Indigent Health Care and Treatment Act (Chapter 61, Health and Safety Code), and Children's Health Insurance Program (CHIP);

(B) for professional services provided in relation to a workers' compensation claim under Title 5, Labor Code; [1] and

(C) for professional services provided to a beneficiary rendered under the TRICARE military health system; and

(2) the actual cost to the health care provider for any uncompensated care provided, but only if the provider maintains records of the uncompensated care for auditing purposes and, if the provider later receives payment for all or part of that care, the provider adjusts the amount excluded for the tax year in which the payment is received.

(n-1) The comptroller shall adopt rules governing:

(1) the computation of the actual cost to a health care provider of any uncompensated care provided under Subsection (n)(2); and

(2) the audit requirements related to the computation of those costs.

(o) A health care provider that is a health care institution shall exclude from its total revenue 50 percent of the amounts described by Subsection (n).

(p) In this section:

(1) "Federal obligations" means:

(A) stocks and other direct obligations of, and obligations unconditionally guaranteed by, the United States government and United States government agencies; and

(B) direct obligations of a United States government-sponsored agency.

(2) "Health care institution" means:

(A) an ambulatory surgical center;

(B) an assisted living facility licensed under Chapter 247, Health and Safety Code;

(C) an emergency medical services provider;

(D) a home and community support services agency;

(E) a hospice;

(F) a hospital;

(G) a hospital system;

(H) an intermediate care facility for the mentally retarded or a home and community-based services waiver program for persons with mental retardation adopted in accordance with Section 1915(c) of the federal Social Security Act (42 U.S.C. Section 1396n);

(I) a birthing center;

(J) a nursing home;

(K) an end stage renal disease facility licensed under Section 251.011, Health and Safety Code; or

(L) a pharmacy.

(3) "Health care provider" means a taxable entity that participates in the Medicaid program, Medicare program, Children's Health Insurance Program (CHIP), state workers' compensation program, or TRICARE military health system as a provider of health care services.

(4) "Obligation" means any bond, debenture, security, mortgage-backed security, pass-through certificate, or other evidence of indebtedness of the issuing entity. The term does not include a deposit, a repurchase agreement, a loan, a lease, a participation in a loan or pool of loans, a loan collateralized by an obligation of a United States government agency, or a loan guaranteed by a United States government agency.

(4-a) "Pro bono services" means the direct provision of legal services to the poor, without an expectation of compensation.

(4-b) Repealed by Acts 2007, 80th Leg., ch. 1282, § 37(2).

(5) "United States government" means any department or ministry of the federal government, including a federal reserve bank. The term does not include a state or local government, a commercial enterprise owned wholly or partly by the United States government, or a local governmental entity or commercial enterprise whose obligations are guaranteed by the United States government.

(6) "United States government agency" means an instrumentality of the United States government whose obligations are fully and explicitly guaranteed as to the timely payment of principal and interest by the full faith and credit of the United States government. The term includes the Government National Mortgage Association, the Department of Veterans Affairs, the Federal Housing Administration, the Farmers Home Administration, the Export-Import Bank, the Overseas Private Investment Corporation, the Commodity Credit Corporation, the Small Business Administration, and any successor agency.

(7) "United States government-sponsored agency" means an agency originally established or chartered by the United States government to serve public purposes specified by the United States Congress but whose obligations are not explicitly guaranteed by the full faith and credit of the United States government. The term includes the Federal Home Loan Mortgage Corporation, the Federal National Mortgage Association, the Farm Credit System, the Federal Home Loan Bank System, the Student Loan Marketing Association, and any successor agency.

(8) "Vaccine" means a preparation or suspension of dead, live attenuated, or live fully virulent viruses or bacteria, or of antigenic proteins derived from them, used to prevent, ameliorate, or treat an infectious disease.

(q) A taxable entity shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), all revenue received that is directly derived from the operation of a facility that is:

(1) located on property owned or leased by the federal government; and

(2) managed or operated primarily to house members of the armed forces of the United States.

(r) A taxable entity shall exclude, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), total revenue received from oil or gas produced, during the dates certified by the comptroller pursuant to Subsection (s), from:

(1) an oil well designated by the Railroad Commission of Texas or similar authority of another state whose production averages less than 10 barrels a day over a 90-day period; and

(2) a gas well designated by the Railroad Commission of Texas or similar authority of another state whose production averages less than 250 mcf a day over a 90-day period.

(s) The comptroller shall certify dates during which the monthly average closing price of West Texas Intermediate crude oil is below $40 per barrel and the average closing price of gas is below $5 per MMBtu, as recorded on the New York Mercantile Exchange (NYMEX).

(t) The comptroller shall adopt rules as necessary to accomplish the legislative intent prescribed by this section.

(u) A taxable entity shall exclude from its total revenue the actual cost paid by the taxable entity for a vaccine.

(v) A taxable entity primarily engaged in the business of transporting goods by waterways that does not subtract cost of goods sold in computing its taxable margin shall exclude from its total revenue direct costs of providing transportation services by intrastate or interstate waterways to the same extent that a taxable entity that sells in the ordinary course of business real or tangible personal property would be authorized by Section 171.1012 to subtract those costs as costs of goods sold in computing its taxable margin, notwithstanding Section 171.1012(e)(3).

(w-1) A taxable entity primarily engaged in the business of providing services as an agricultural aircraft operation, as defined by 14 C.F.R. Section 137.3, shall exclude from its total revenue the cost of labor, equipment, fuel, and materials used in providing those services.

(x) A taxable entity that is registered as a motor carrier under Chapter 643, Transportation Code, shall exclude from its total revenue, to the extent included under Subsection (c)(1)(A), (c)(2)(A), or (c)(3), flow-through revenue derived from taxes and fees.

**Credits**

Added by Acts 2006, 79th Leg., 3rd C.S., ch. 1, § 5, eff. Jan. 1, 2008. Amended by Acts 2007, 80th Leg., ch. 1282, §§ 12, 13, 37(2), eff. Jan. 1, 2008; Acts 2009, 81st Leg., ch. 1360, § 3(a), eff. Jan. 1, 2010; Acts 2011, 82nd Leg., 1st C.S., ch. 4 (S.B. 1), § 45.03, eff. Jan. 1, 2012; Acts 2013, 83rd Leg., ch. 117 (S.B. 1286), § 25, eff. Sept. 1, 2013; Acts 2013, 83rd Leg., ch. 1006 (H.B. 2451), § 1, eff. Jan. 1, 2014; Acts 2013, 83rd Leg., ch. 1034 (H.B. 2766), § 1, eff. Jan. 1, 2014; Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), §§ 7, 8, eff. Jan. 1, 2014; Acts 2017, 85th Leg., ch. 703 (H.B. 3254), § 1, eff. Jan. 1, 2018.

Notes of Decisions (9)

Footnotes

1    V.T.C.A., Labor Code § 401.001 et seq.

V. T. C. A., Tax Code § 171.1011, TX TAX § 171.1011

Current through the end of the 2017 Regular and First Called Sessions of the 85th Legislature

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX D-2

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
  Tax Code (Refs & Annos)
    Title 2. State Taxation (Refs & Annos)
      Subtitle F. Franchise Tax (Refs & Annos)
        Chapter 171. Franchise Tax (Refs & Annos)
          Subchapter C. Determination of Taxable Margin; Allocation and Apportionment

V.T.C.A., Tax Code § 171.1012

§ 171.1012. Determination of Cost of Goods Sold

Effective: September 1, 2017
Currentness

(a) In this section:

(1) "Goods" means real or tangible personal property sold in the ordinary course of business of a taxable entity.

(2) "Production" means construction, manufacture, development, mining, extraction, improvement, creation, raising, or growth.

(3)(A) "Tangible personal property" means:

(i) personal property that can be seen, weighed, measured, felt, or touched or that is perceptible to the senses in any other manner;

(ii) films, sound recordings, videotapes, live and prerecorded television and radio programs, books, and other similar property embodying words, ideas, concepts, images, or sound, without regard to the means or methods of distribution or the medium in which the property is embodied, for which, as costs are incurred in producing the property, it is intended or is reasonably likely that any medium in which the property is embodied will be mass-distributed by the creator or any one or more third parties in a form that is not substantially altered; and

(iii) a computer program, as defined by Section 151.0031.

(B) "Tangible personal property" does not include:

(i) intangible property; or

(ii) services.

(b) Subject to Section 171.1014, a taxable entity that elects to subtract cost of goods sold for the purpose of computing its taxable margin shall determine the amount of that cost of goods sold as provided by this section.

(c) The cost of goods sold includes all direct costs of acquiring or producing the goods, including:

(1) labor costs;

(2) cost of materials that are an integral part of specific property produced;

(3) cost of materials that are consumed in the ordinary course of performing production activities;

(4) handling costs, including costs attributable to processing, assembling, repackaging, and inbound transportation costs;

(5) storage costs, including the costs of carrying, storing, or warehousing property, subject to Subsection (e);

(6) depreciation, depletion, and amortization, reported on the federal income tax return on which the report under this chapter is based, to the extent associated with and necessary for the production of goods, including recovery described by Section 197, Internal Revenue Code;

(7) the cost of renting or leasing equipment, facilities, or real property directly used for the production of the goods, including pollution control equipment and intangible drilling and dry hole costs;

(8) the cost of repairing and maintaining equipment, facilities, or real property directly used for the production of the goods, including pollution control devices;

(9) costs attributable to research, experimental, engineering, and design activities directly related to the production of the goods, including all research or experimental expenditures described by Section 174, Internal Revenue Code;

(10) geological and geophysical costs incurred to identify and locate property that has the potential to produce minerals;

(11) taxes paid in relation to acquiring or producing any material, or taxes paid in relation to services that are a direct cost of production;

(12) the cost of producing or acquiring electricity sold; and

(13) a contribution to a partnership in which the taxable entity owns an interest that is used to fund activities, the costs of which would otherwise be treated as cost of goods sold of the partnership, but only to the extent that those costs are related to goods distributed to the taxable entity as goods-in-kind in the ordinary course of production activities rather than being sold.

(d) In addition to the amounts includable under Subsection (c), the cost of goods sold includes the following costs in relation to the taxable entity's goods:

(1) deterioration of the goods;

(2) obsolescence of the goods;

(3) spoilage and abandonment, including the costs of rework labor, reclamation, and scrap;

(4) if the property is held for future production, preproduction direct costs allocable to the property, including costs of purchasing the goods and of storage and handling the goods, as provided by Subsections (c)(4) and (c)(5);

(5) postproduction direct costs allocable to the property, including storage and handling costs, as provided by Subsections (c)(4) and (c)(5);

(6) the cost of insurance on a plant or a facility, machinery, equipment, or materials directly used in the production of the goods;

(7) the cost of insurance on the produced goods;

(8) the cost of utilities, including electricity, gas, and water, directly used in the production of the goods;

(9) the costs of quality control, including replacement of defective components pursuant to standard warranty policies, inspection directly allocable to the production of the goods, and repairs and maintenance of goods; and

(10) licensing or franchise costs, including fees incurred in securing the contractual right to use a trademark, corporate plan, manufacturing procedure, special recipe, or other similar right directly associated with the goods produced.

(e) The cost of goods sold does not include the following costs in relation to the taxable entity's goods:

(1) the cost of renting or leasing equipment, facilities, or real property that is not used for the production of the goods;

(2) selling costs, including employee expenses related to sales;

(3) distribution costs, including outbound transportation costs;

(4) advertising costs;

(5) idle facility expense;

(6) rehandling costs;

(7) bidding costs, which are the costs incurred in the solicitation of contracts ultimately awarded to the taxable entity;

(8) unsuccessful bidding costs, which are the costs incurred in the solicitation of contracts not awarded to the taxable entity;

(9) interest, including interest on debt incurred or continued during the production period to finance the production of the goods;

(10) income taxes, including local, state, federal, and foreign income taxes, and franchise taxes that are assessed on the taxable entity based on income;

(11) strike expenses, including costs associated with hiring employees to replace striking personnel, but not including the wages of the replacement personnel, costs of security, and legal fees associated with settling strikes;

(12) officers' compensation;

(13) costs of operation of a facility that is:

   (A) located on property owned or leased by the federal government; and

   (B) managed or operated primarily to house members of the armed forces of the United States; and

(14) any compensation paid to an undocumented worker used for the production of goods. As used in this subdivision:

   (A) "undocumented worker" means a person who is not lawfully entitled to be present and employed in the United States; and

   (B) "goods" includes the husbandry of animals, the growing and harvesting of crops, and the severance of timber from realty.

(f) A taxable entity may subtract as a cost of goods sold indirect or administrative overhead costs, including all mixed service costs, such as security services, legal services, data processing services, accounting services, personnel operations, and general financial planning and financial management costs, that it can demonstrate are allocable to the acquisition or production of goods, except that the amount subtracted may not exceed four percent of the taxable entity's total indirect or administrative overhead costs, including all mixed service costs. Any costs excluded under Subsection (e) may not be subtracted under this subsection.

(g) A taxable entity that is allowed a subtraction by this section for a cost of goods sold and that is subject to Section 263A, 460, or 471, Internal Revenue Code, may capitalize that cost in the same manner and to the same extent that the taxable entity capitalized that cost on its federal income tax return or may expense those costs, except for costs excluded under Subsection (e), or in accordance with Subsections (c), (d), and (f). If the taxable entity elects to capitalize costs, it must capitalize each cost allowed under this section that it capitalized on its federal income tax return. If the taxable entity later elects to begin expensing a cost that may be allowed under this section as a cost of goods sold, the entity may not deduct any cost in ending inventory from a previous report. If the taxable entity elects to expense a cost of goods sold that may be allowed under this section, a cost incurred before the first day of the period on which the report is based may not be subtracted as a cost of goods sold. If the taxable entity elects to expense a cost of goods sold and later elects to capitalize that cost of goods sold, a cost expensed on a previous report may not be capitalized.

(h) A taxable entity shall determine its cost of goods sold, except as otherwise provided by this section, in accordance with the methods used on the federal income tax return on which the report under this chapter is based. This subsection does not affect the type or category of cost of goods sold that may be subtracted under this section.

(i) A taxable entity may make a subtraction under this section in relation to the cost of goods sold only if that entity owns the goods. The determination of whether a taxable entity is an owner is based on all of the facts and circumstances, including the various benefits and burdens of ownership vested with the taxable entity. A taxable entity furnishing labor or materials to a project for the construction, improvement, remodeling, repair, or industrial maintenance (as the term "maintenance" is defined in 34 T.A.C. Section 3.357) of real property is considered to be an owner of that labor or materials and may include the costs, as allowed by this section, in the computation of cost of goods sold. Solely for purposes of this section, a taxable entity shall be treated as the owner of goods being manufactured or produced by the entity under a contract with the federal government, including any subcontracts that support a contract with the federal government, notwithstanding that the Federal Acquisition Regulation may require that title or risk of loss with respect to those goods be transferred to the federal government before the manufacture or production of those goods is complete.

(j) A taxable entity may not make a subtraction under this section for cost of goods sold to the extent the cost of goods sold was funded by partner contributions and deducted under Subsection (c)(13).

(k) Notwithstanding any other provision of this section, if the taxable entity is a lending institution that offers loans to the public and elects to subtract cost of goods sold, the entity, other than an entity primarily engaged in an activity described by category 5932 of the 1987 Standard Industrial Classification Manual published by the federal Office of Management and Budget, may subtract as a cost of goods sold an amount equal to interest expense. For purposes of this subsection, an entity engaged in lending to unrelated parties solely for agricultural production offers loans to the public.

(k-1) Notwithstanding any other provision of this section, the following taxable entities may subtract as a cost of goods sold the costs otherwise allowed by this section in relation to tangible personal property that the entity rents or leases in the ordinary course of business of the entity:

(1) a motor vehicle rental or leasing company that remits a tax on gross receipts imposed under Section 152.026;

(2) a heavy construction equipment rental or leasing company; and

(3) a railcar rolling stock rental or leasing company.

(k-2) This subsection applies only to a pipeline entity: (1) that owns or leases and operates the pipeline by which the product is transported for others and only to that portion of the product to which the entity does not own title; and (2) that is primarily engaged in gathering, storing, transporting, or processing crude oil, including finished petroleum products, natural gas, condensate, and natural gas liquids, except for a refinery installation that manufactures finished petroleum products from crude oil. Notwithstanding Subsection (e)(3) or (i), a pipeline entity providing services for others related to the product that the pipeline does not own and to which this subsection applies may subtract as a cost of goods sold its depreciation, operations, and maintenance costs allowed by this section related to the services provided.

(k-3) For purposes of Subsection (k-2), "processing" means the physical or mechanical removal, separation, or treatment of crude oil, including finished petroleum products, natural gas, condensate, and natural gas liquids after those materials are produced from the earth. The term does not include the chemical or biological transformation of those materials.

(l) Notwithstanding any other provision of this section, a payment made by one member of an affiliated group to another member of that affiliated group not included in the combined group may be subtracted as a cost of goods sold only if it is a transaction made at arm's length.

(m) In this section, "arm's length" means the standard of conduct under which entities that are not related parties and that have substantially equal bargaining power, each acting in its own interest, would negotiate or carry out a particular transaction.

(n) In this section, "related party" means a person, corporation, or other entity, including an entity that is treated as a pass-through or disregarded entity for purposes of federal taxation, whether the person, corporation, or entity is subject to the tax under this chapter or not, in which one person, corporation, or entity, or set of related persons, corporations, or entities, directly or indirectly owns or controls a controlling interest in another entity.

(o) If a taxable entity, including a taxable entity with respect to which cost of goods sold is determined pursuant to Section 171.1014(e)(1), whose principal business activity is film or television production or broadcasting or the distribution of tangible personal property described by Subsection (a)(3)(A)(ii), or any combination of these activities, elects to subtract cost of goods sold, the cost of goods sold for the taxable entity shall be the costs described in this section in relation to the property and include depreciation, amortization, and other expenses directly related to the acquisition, production, or use of the property, including expenses for the right to broadcast or use the property.

(p) to (s) [Blank].

(t) If a taxable entity that is a movie theater elects to subtract cost of goods sold, the cost of goods sold for the taxable entity shall be the costs described by this section in relation to the acquisition, production, exhibition, or use of a film or motion picture, including expenses for the right to use the film or motion picture.

**Credits**
Added by Acts 2006, 79th Leg., 3rd C.S., ch. 1, § 5, eff. Jan. 1, 2008. Amended by Acts 2007, 80th Leg., ch. 1282, §§ 14, 15, eff. Jan. 1, 2008; Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), § 9, eff. Jan. 1, 2014; Acts 2013, 83rd Leg., ch. 1232 (H.B. 500), § 10(a), eff. Sept. 1, 2013; Acts 2017, 85th Leg., ch. 377 (H.B. 4002), § 1, eff. Sept. 1, 2017.

Notes of Decisions (12)

V. T. C. A., Tax Code § 171.1012, TX TAX § 171.1012
Current through the end of the 2017 Regular and First Called Sessions of the 85th Legislature

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX D-3

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
  Property Code (Refs & Annos)
    Title 5. Exempt Property and Liens
      Subtitle B. Liens
        Chapter 53. Mechanic's, Contractor's, or Materialman's Lien (Refs & Annos)
          Subchapter A. General Provisions

V.T.C.A., Property Code § 53.001

§ 53.001. Definitions

[Currentness]

In this chapter:

(1) "Contract price" means the cost to the owner for any part of construction or repair performed under an original contract.

(2) "Improvement" includes:

(A) abutting sidewalks and streets and utilities in or on those sidewalks and streets;

(B) clearing, grubbing, draining, or fencing of land;

(C) wells, cisterns, tanks, reservoirs, or artificial lakes or pools made for supplying or storing water;

(D) pumps, siphons, and windmills or other machinery or apparatuses used for raising water for stock, domestic use, or irrigation; and

(E) planting orchard trees, grubbing out orchards and replacing trees, and pruning of orchard trees.

(3) "Labor" means labor used in the direct prosecution of the work.

(4) "Material" means all or part of:

(A) the material, machinery, fixtures, or tools incorporated into the work, consumed in the direct prosecution of the work, or ordered and delivered for incorporation or consumption;

(B) rent at a reasonable rate and actual running repairs at a reasonable cost for construction equipment used or reasonably required and delivered for use in the direct prosecution of the work at the site of the construction or repair; or

(C) power, water, fuel, and lubricants consumed or ordered and delivered for consumption in the direct prosecution of the work.

(5) "Mechanic's lien" means the lien provided by this chapter.

(6) "Original contract" means an agreement to which an owner is a party either directly or by implication of law.

(7) "Original contractor" means a person contracting with an owner either directly or through the owner's agent.

(8) "Residence" means a single-family house, duplex, triplex, or quadruplex or a unit in a multiunit structure used for residential purposes that is:

(A) owned by one or more adult persons; and

(B) used or intended to be used as a dwelling by one of the owners.

(9) "Residential construction contract" means a contract between an owner and a contractor in which the contractor agrees to construct or repair the owner's residence, including improvements appurtenant to the residence.

(10) "Residential construction project" means a project for the construction or repair of a new or existing residence, including improvements appurtenant to the residence, as provided by a residential construction contract.

(11) "Retainage" means an amount representing part of a contract payment that is not required to be paid to the claimant within the month following the month in which labor is performed, material is furnished, or specially fabricated material is delivered. The term does not include retainage under Subchapter E. [1]

(12) "Specially fabricated material" means material fabricated for use as a component of the construction or repair so as to be reasonably unsuitable for use elsewhere.

(13) "Subcontractor" means a person who has furnished labor or materials to fulfill an obligation to an original contractor or to a subcontractor to perform all or part of the work required by an original contract.

(14) "Work" means any part of construction or repair performed under an original contract.

(15) "Completion" of an original contract means the actual completion of the work, including any extras or change orders reasonably required or contemplated under the original contract, other than warranty work or replacement or repair of the work performed under the contract.

**Credits**

Acts 1983, 68th Leg., p. 3533, ch. 576, § 1, eff. Jan. 1, 1984. Amended by Acts 1997, 75th Leg., ch. 526, § 2, eff. Sept. 1, 1997; Acts 1999, 76th Leg., ch. 889, § 1, eff. Sept. 1, 1999.

**Editors' Notes**

**REVISOR'S NOTE**

**2014 Main Volume**

(1) The revised law omits the source law provision that materials qualify as specially fabricated even if not delivered because the provision is unnecessary as part of the definition. The provision has the substantive effect of making the mechanic's lien attach even if the material is not delivered, and that is expressly provided for in Section 53.021(b).

(2) The revised law adds the definition of "mechanic's lien" for drafting convenience.

Notes of Decisions (47)

Footnotes

1        V.T.C.A., Property Code § 53.101 et seq.

V. T. C. A., Property Code § 53.001, TX PROPERTY § 53.001

Current through the end of the 2017 Regular and First Called Sessions of the 85th Legislature

**End of Document**                                   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX D-4

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
  Property Code (Refs & Annos)
    Title 5. Exempt Property and Liens
      Subtitle B. Liens
        Chapter 53. Mechanic's, Contractor's, or Materialman's Lien (Refs & Annos)
          Subchapter B. Persons Entitled to Lien; Subject Property (Refs & Annos)

V.T.C.A., Property Code § 53.021

§ 53.021. Persons Entitled to Lien

Effective: September 1, 2003
Currentness

(a) A person has a lien if:

(1) the person labors, specially fabricates material, or furnishes labor or materials for construction or repair in this state of:

(A) a house, building, or improvement;

(B) a levee or embankment to be erected for the reclamation of overflow land along a river or creek; or

(C) a railroad; and

(2) the person labors, specially fabricates the material, or furnishes the labor or materials under or by virtue of a contract with the owner or the owner's agent, trustee, receiver, contractor, or subcontractor.

(b) A person who specially fabricates material has a lien even if the material is not delivered.

(c) An architect, engineer, or surveyor who prepares a plan or plat under or by virtue of a written contract with the owner or the owner's agent, trustee, or receiver in connection with the actual or proposed design, construction, or repair of improvements on real property or the location of the boundaries of real property has a lien on the property.

(d) A person who provides labor, plant material, or other supplies for the installation of landscaping for a house, building, or improvement, including the construction of a retention pond, retaining wall, berm, irrigation system, fountain, or other similar installation, under or by virtue of a written contract with the owner or the owner's agent, contractor, subcontractor, trustee, or receiver has a lien on the property.

(e) A person who performs labor as part of, or who furnishes labor or materials for, the demolition of a structure on real property under or by virtue of a written contract with the owner of the property or the owner's agent, trustee, receiver, contractor, or subcontractor has a lien on the property.

**Credits**

Acts 1983, 68th Leg., p. 3535, ch. 576, § 1, eff. Jan. 1, 1984. Amended by Acts 1989, 71st Leg., ch. 395, § 1, eff. Sept. 1, 1989; Acts 1989, 71st Leg., ch. 1138, § 1, eff. Sept. 1, 1989; Acts 1991, 72nd Leg., ch. 16, § 16.01, eff. Aug. 26, 1991; Acts 1995, 74th Leg., ch. 851, §§ 1, 6, eff. Sept. 1, 1995; Acts 1999, 76th Leg., ch. 896, § 1, eff. Sept. 1, 1999; Acts 2003, 78th Leg., ch. 410, § 1, eff. Sept. 1, 2003; Acts 2011, 82nd Leg., ch. 271 (H.B. 1456), § 1, eff. Jan. 1, 2012.

**Editors' Notes**

### REVISOR'S NOTE

### 2014 Main Volume

The revised law omits the references to a "firm" and a "corporation" because those entities are included in the definition of "person" under the Code Construction Act (V.A.C.S. Article 5429b-2).

Notes of Decisions (143)

V. T. C. A., Property Code § 53.021, TX PROPERTY § 53.021
Current through the end of the 2017 Regular and First Called Sessions of the 85th Legislature

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX D-5

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

Vernon's Texas Statutes and Codes Annotated
  Property Code (Refs & Annos)
    Title 5. Exempt Property and Liens
      Subtitle B. Liens
        Chapter 53. Mechanic's, Contractor's, or Materialman's Lien (Refs & Annos)
          Subchapter B. Persons Entitled to Lien; Subject Property (Refs & Annos)

V.T.C.A., Property Code § 53.023

§ 53.023. Payment Secured by Lien

Currentness

The lien secures payment for:

(1) the labor done or material furnished for the construction or repair;

(2) the specially fabricated material, even if the material has not been delivered or incorporated into the construction or repair, less its fair salvage value; or

(3) the preparation of a plan or plat by an architect, engineer, or surveyor in accordance with Section 53.021(c).

**Credits**
Acts 1983, 68th Leg., p. 3536, ch. 576, § 1, eff. Jan. 1, 1984. Amended by Acts 1995, 74th Leg., ch. 851, § 2, eff. Sept. 1, 1995.

Notes of Decisions (3)

V. T. C. A., Property Code § 53.023, TX PROPERTY § 53.023
Current through the end of the 2017 Regular and First Called Sessions of the 85th Legislature

**End of Document**
© 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.